# UNITED STATES DISTRICT COURT
# IN THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| LAKISHA T SMITH,<br><br><br>           Plaintiff,<br><br>v.<br><br><br>STELLAR RECOVERY, INC;<br>COMCAST CORPORATION;<br>COMCAST OF DETROIT, LLC,<br><br><br>           Defendant(s). | Case No. 2:15-cv- 11717-SJM- MKM<br><br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT** |

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| LAKISHA T SMITH,<br><br>       Plaintiff,<br><br>v.<br><br>STELLAR RECOVERY, INC;<br>COMCAST CORPORATION;<br>COMCAST OF DETROIT, LLC,<br><br>      Defendant(s). | Case No. 2:15-cv- 11717-SJM- MKM<br><br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiff Lakisha T. Smith ("Plaintiff"), pursuant to Fed. R. Civ. P. 56, moves the Court for an Order granting summary judgment on her claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq.  Plaintiff states that the pleadings, the affidavits and exhibits filed herein provide support for her motion, show that there is no genuine issue as to any material fact, and show that Plaintiff is entitled to judgment as a matter of law on her TCPA claims.

In support of her motion, Plaintiff submits:

1. Plaintiff's Brief In Support Of Motion For Summary Judgment;

2. Affidavit Of Stephen A. Thomas And Index Of Authenticated Exhibits In Support Of Motion For Summary Judgment.

WHEREFORE, Plaintiff requests that the Court grant her Motion for Partial Summary Judgment and enter a judgment in favor of Plaintiff as further requested in the legal brief submitted herewith.

Respectfully submitted,

/s/ Stephen A. Thomas

Dated: July 12, 2016

STEPHEN A. THOMAS P43260
Attorney for Plaintiff
645 Griswold St., Suite 1360
Detroit, Michigan  48226
313-965-2265
sthomas@313965bank.com

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................... ii

CONCISE STATEMENT OF ISSUES PRESENTED................................................... viii

INTRODUCTION ...............................................................................................1

STATEMENT OF UNDISPUTED FACTS ....................................................................2

STANDARD OF REVIEW ...................................................................................8

OVERVIEW OF THE TCPA ................................................................................9

    A.  Automatic Telephone Dialing System ....................................................9

    B.  Human Intervention ........................................................................10

    C.  Prior Express Consent as An Affirmative Defense..................................12

    D.  Prior Express Consent Must be Given at the Time of the Transaction.................14

    E.  Plaintiff Need Not Be Charged For The Autodialed Call......................14

    F.  Debt Collectors Must Comply with the TCPA ....................................15

    G.  Unanswered Calls Count As Violations .............................................15

    H.  Statutory Damages Under The TCPA.................................................16

    I.   Willful and Knowing Damages Under The TCPA ................................17

PLAINTIFF'S TELEPHONE CONSUMER PROTECTION ACT CLAIMS.................18

Defendant's TCPA Liability to Plaintiff..........................................................18

The HCI Dialing Equipment ..........................................................................19

The "Clicker agents"....................................................................................20

Human Intervention .....................................................................................20

CONCLUSION.............................................................................................23

RELIEF REQUESTED....................................................................................24

i

# INDEX OF AUTHORITIES

**CASES:**

*A Fast Sign Co., Inc. v. Am. Home Svcs., Inc.*,
    747 SE2d 205. 208-09 (Ga. App. 2012) ................................................................18

*Abbas v. Selling Source, LLC,*
    2009 U.S. Dist. LEXIS 116697, 6-7 (N.D. Ill. Dec. 14, 2009)............................14

*Alea London Ltd. v. Am. Home Servs., Inc.,*
    638 F.3d 768, 776 (11th Cir. 2011) .................................................................9, 16

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ...................................9

*Bates v. I.C. Sys*.,
    2009 U.S. Dist. LEXIS 96488 (W.D.N.Y. Oct. 19, 2009)....................................12

*Blastfax* ................................................................................................................17

*Bluestone*...............................................................................................................17

*Bonime v. Avaya, Inc*., 547 F.3d 497, 499 (2d Cir. N.Y. 2008)........................15

*Boyce Motor Lines, Inc. v. United States* (1952),
    342 U.S. 337, 345, 72 S.Ct. 329, 96 L.Ed. 367 ...................................................18

*Bransky v. Shahrokhi*,
    2005 Ohio 97 (Ohio Ct. App., Cuyahoga County, Jan. 13, 2005).......................16

*Bryan v. United States* (1998),
    524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197.................................................17

*Buslepp v. Improv Miami, Inc*.,
    2012 U.S. Dist. LEXIS 62489, 4-5 (S.D. Fla. May 4, 2012)................................14

*Castro v. Green Tree Servicing LLC*,
    No. 10-cv-7211, 2013 WL 4105196, at *18 (S.D.N.Y. Aug. 14, 2013)...............15

*Cedillo v. Int'l Assoc. of Bridge & Structural Iron Workers, Local Union No. 1*,
    603 F.2d 7, 10 (7th Cir, 1979). ..............................................................................8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................8

*Chair King, Inc. v. Houston Cellular Corp*.,
    1995 WL 1693093 (S.D. Tex. Nov. 2, 1995) ......................................................16

*Charvat v. NMP, LLC*, 2012 U.S. Dist. LEXIS 139505 (S.D. Ohio Sept. 27, 2012) ........16

*Charvat v. Ryan*, 116 Ohio St. 3d 394, 398 (Ohio 2007) ...................................................17

*Charvat*, 879 N.E.2d at 770 ................................................................................................17

*In re Collecto, Inc.,* 2016 WL 552459, at *4 (D. Mass., 2016) ..........................................23

*D.G. v. Diversified Adjustment Serv., Inc.,*
    No. 112062, 2011 WL 5506078, at *3 (N.D. Ill. Oct. 18, 2011)..........................12

*Davis v. Diversified Consultants, Inc.*,
    36 F. Supp. 3d 217, 225-226 (D. Mass. 2014).......................................................23

*Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010).................12

*Fillichio v. M.R.S. Assocs.*,
    2010 U.S. Dist. LEXIS 112780 (S.D. Fla. Oct. 19, 2010)....................................16

*First Nat'l Collection Bureau, Inc. v. Walker*,
    348 S.W.3d 329, 346 (Tex. App. Dallas 2011)......................................................16

*Gottlieb v. Carnival Corp.*, 595 F. Supp. 2d 212, 221-222 (E.D.N.Y. 2009)....................13

*Grant v. Capital Mgmt. Servs., L.P.,*
    449 Fed. Appx. 598, 600 (9th Cir. Cal. 2011) .......................................................12

*Gragg v. Orange Cab Co., Inc.*,
    995 F. Supp. 2d 1189, 1193-1194 (W.D. Wash. 2014) .........................................23

*Gutierrez v. Barclays Group*,
    2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011) ........................................14

*Harris v. World Fin. Network Nat'l Bank*,
    2012 U.S. Dist. LEXIS 46882, 8-9 (E.D. Mich. Apr. 3, 2012) .............................16

*J2 Global Communs., Inc. v. Blue Jay, Inc.*,
    2009 U.S. Dist. LEXIS 111609 (N.D. Cal. Aug. 4, 2009)....................................24

*Johnson v. Yahoo!, Inc.*, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014) ..................23

*Kane v. Nat'l Action Fin. Servs.*,
    2011 U.S. Dist. LEXIS 141480, 21-22 ( E.D. Mich. Nov. 7, 2011).....................14

*Kaplan v. First City Mortg.* 183 Misc.2d 24 (NY City Ct. 1999) .....................................17

iii

*Kopff v. Roth*, 2007 U.S. Dist. LEXIS 43702,
2007 WL 1748918, at *2 (D.D.C. June 15, 2007) ................................16

*Leckler v. Cashcall, Inc*., 554 F. Supp. 2d 1025, 1030 (N.D. Cal. 2008) .........................13

*Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716 (S.D. Tex. 2011) ...............................12, 14

*Lozano v. Twentieth Century Fox Film Corp*.,
702 F. Supp. 2d 999, 1010 (N.D. Ill. 2010) ...........................................14

*Luna v. Shac*, 2015 WL 4941781, at *5 (N.D. Cal. Aug. 19, 2015)...................................23

*Martin v. Bureau of Collection Recovery,
No. 107725, 2011 WL 2311869, at *1 (N.D. Ill. June 13, 2011)*..........................12

*Martin v. Leading Edge Recovery Solutions*, LLC,
2012 U.S. Dist. LEXIS 112795, 17-18 (N.D. Ill. Aug. 10, 2012) ..................14, 15

*Melrose Hotel Co. v. St Paul Fire and Marine Ins. Co*.,
432 F.Supp.2d 488, 2006 TCPA Rep. 1640 (E.D.Pa. Apr. 19, 2006) ..................16

*Meyer*, 696 F.3d 943, 949, 2012 U.S. App. LEXIS 21136,
**7-8, 83 Fed. R. Serv. 3d (Callaghan) 1039 (9th Cir. 2012) .................................14

*Mims v. Arrow Fin. Serv. LLC*, 132 S. Ct. 740, 745 (U.S. 2012). ...........................2, 15, 16

*Mitchem v. Ill. Collection Serv*.,
2010 U.S. Dist. LEXIS 76581 (N.D. Ill. July 29, 2010).........................................14

*Park University Enterprises, Inc. v American Casualty Company of Reading, PA*,
314 F. Supp 2d 104  (D. Kansas 2004) ..................................................16

*Penzer v. Transp. Ins.Co.,* 545 F.3d 1303, 1311 (11th Cir. 2008)....................................16

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. Cal. 2009). ............12, 15, 16

*Sengenberger v. Credit Control Servs*.,
2010 U.S. Dist. LEXIS 142528, 3-4 (N.D. Ill. June 17, 2010)..............................17

*Sengenberger v. Credit Control Servs*.,
2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010) ........................................24

*Silbaugh v. Omni Credit*, 2012 U.S. Dist. LEXIS 11175 (D. Md. Jan. 31, 2012).............15

*Silbaugh v. Viking Magazine Servs*., 278 F.R.D. 389, 393 (N.D. Ohio 2012) .................14

iv

*Smith v. Microsoft Corp.*,
 2012 U.S. Dist. LEXIS 101197, 13-15 (S.D. Cal. July 20, 2012) ..................14, 15

*Smith v. Wade*, 461 U.S. 30, 41 n.8, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)...............17

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. Ill. 2012)................13, 15


*Stewart v. Regent Asset Mgmt. Solutions*,
 2011 U.S. Dist. LEXIS 50046, 19-20 (N.D. Ga. May 4, 2011)......................17, 18

*Stern v. Bluestone*, 2008 NY Slip Op 611 (N.Y. App. Div. 1st Dep't 2008)....................17

*Stern v. Bluestone*, 12 NY3d 873 (2009) ...........................................................17

*Texas v. American Blastfax, Inc.*,
 164 F.Supp.2d 892, 899–901 (W.D.Tex.2001)......................................................17

*Torres v. Nat'l Enter. Sys.*, 2012 U.S. Dist. LEXIS 110514 (N.D. Ill. Aug. 7, 2012) .......14

*ThrasherLyon v. Ill. Farmers Ins. Co.*,
 2012 U.S. Dist. LEXIS 50560, 910 (N.D. Ill. Mar. 20, 2012)..............................12

*Thrasher-Lyon*, LEXIS 125203 at 16-17 .........................................................13

*Thrasher-Lyon v. CCS Commer., LLC*,
 2012 U.S. Dist. LEXIS 125203 (N.D. Ill. Sept. 4, 2012) ......................................13

*Weitzner v. Iridex Corp.*,
 2006 U.S. Dist. LEXIS 44317, 12-13 (E.D.N.Y. June 29, 2006).........................13

**FEDERAL RULES:**

Fed. R. Civ. Pro. 56(a) ...........................................................................................8

**LOCAL RULES:**

**FEDERAL STATUTES:**

47 U.S.C. § 227 et seq..........................................................................................1

47 U.S.C. § 227(a)(1)........................................................................................9, 19

47 U.S.C. §227(b) ..............................................................................................17

47 U.S.C.§ 227(b)(1)( ......................................................................................11

47 U.S.C.§ 227(b)(1)(A) ...........................................................................15, 16

47 U.S.C. § 227(b)(1)(A)(iii) .......................................................................9, 12

47 U.S.C. § 227(b)(3) .................................................................................17, 24

47 U.S.C. § 227(b)(3)(B). ............................................................................9, 16

**FCC Reports and Decisions:**

*In the Matter of Rules & Regulations Implementing*
     *the Telephone Consumer Protection Act of 1991* ...................................14


*In the Matter of Rules & Regulations Implementing*
     *the Telephone Consumer Protection Act of 1991,*
     2003 WL 21517853, 18 F.C.C.R. 14014 ¶ 131-2
     (Fed. Commc'n Cmm'n July 3, 2003). ....................................................9

*In the Matter of Rules & Regulations Implementing*
     *the Telephone Consumer Protection Act of 1991,*
     2008 WL 65485, 23 F.C.C.R. 559 ¶ 12
     (Fed Commc'n Cmm'n, Jan. 4, 2008)....................................................2, 9

*In the Matter of Rules & Regulations*
     *Implementing the Tel. Consumer Prot. Act of 1991,*
     CG02-278, ¶¶10-24 (OHMSV July 10, 2015). ...........................4, 9, 10, 18, 21, 22

*In the Matter of Rules and Regulations*
     *Implementing the Telephone Consumer Protection Act of 1991* ...........................14

*Request of ACA International for*
     *Clarification and Declaratory Ruling*, CG Docket No. 02-278 ...........................15

23 F.C.C.R. 559, 565 (Dec. 28, 2007) ....................................................12

18 FCC Rcd. at 14091...............................................................................23


*Request of ACA International for Clarification and*
     *Declaratory Ruling*, 23 FCC Rcd. 559, 565 (Jan. 4, 2008) .................................14

Release number FCC 070232 ......................................................................15

23 FCC Rcd 559, 565; 2008 FCC LEXIS 56; 43 Comm. Reg.
    (P & F) 877 (Jan. 4, 2008) ("ACA Declaratory Ruling"), at ¶ 11 ........................15

**Other Authorities:**

*Black's Law Dictionary* 323 (8th ed. 2004). .......................................................................12

Black's Law Dictionary 276 (5th ed.1979) ........................................................................13

**CONCISE STATEMENT OF ISSUES PRESENTED**

1.     Whether the Defendant's HCI (Human Call Initiator) is an Automatic Telephone Dialing

System under the FCC's 2015 Ruling.

**Plaintiff Answers: Yes.**

**Defendants Answers: No.**

**UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| LAKISHA T SMITH,<br><br>             Plaintiff,<br><br>v.<br><br>STELLAR RECOVERY, INC.;<br>COMCAST CORPORATION;<br>COMCAST OF DETROIT, LLC,<br><br>             Defendant(s). | Case No. 2:15-cv- 11717-SJM- MKM<br><br><br>**BRIEF IN SUPPORT OF MOTION FOR<br>PARTIAL SUMMARY JUDGMENT** |

**INTRODUCTION**

    You can't have one without the other.  There is no honey without the bee.  There are no Beatles without John Lennon.  And there is no Livevox's Automatic Telephone Dialing System (ATDS) without the Automatic Call Distributor (ACD) and its Media Server Pool.  Defendants argue that their Human Call Initiator (HCI) is not an ATDS and therefore is not subject to the TCPA.  The FCC regulates Autodialers.  The Livevox Dialing System uses an ACD which has the capacity to store numbers.  By definition, it makes Livevox an ATDS.  Defendants used their ATDS "robo-dialer" to call the Plaintiff Smith 53 times without her prior express consent. Instead, Defendants obtained Plaintiff's cell phone number by skip tracing it without her prior express consent.  The Plaintiff has sued under the Telephone Consumer Protection Act (TCPA) 47 U.S.C. § 227 et seq. as well as the Fair Debt Collection Practices Act. (FDCPA) 15 U.S.C. § 1692 et seq.  Defendant Stellar Recovery, Inc. ("Stellar") is fully aware that using an automatic dialer to call consumers' cell phones is illegal, as it has been getting sued for this conduct. Likewise, Defendants Comcast Corporation and Comcast of Detroit, LLC are equally liable for

this same conduct under a 2008 FCC Order regarding robodialing by debt collectors. Defendants' actions, and the resultant invasion of Plaintiff's privacy, were exactly what the TCPA was intended to prevent. *Mims v. Arrow Fin. Serv. LLC*, 132 S. Ct. 740, 745 (U.S. 2012).

   Plaintiff now moves for summary judgment on the TCPA claims as to all Defendants.

## STATEMENT OF UNDISPUTED FACTS ("SUF")

1. Plaintiff Lakisha Smith filed Chapter 7 Bankruptcy on May 6, 2014 in the U.S. Bankruptcy Court for the Eastern District of Michigan. **Plaintiff Complaint [Doc. 10], pp. 5-6 ¶23.**

2. Plaintiff Smith properly listed Defendant Stellar Recovery, Inc. in her bankruptcy schedules. **Plaintiff Complaint [Doc. 10], pp. 5-6 ¶23.**

3. Defendant Stellar was properly notified of the bankruptcy filing. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer pp. 73-76. p. 77 L 13-19; Exhibit H. p 3.**

4. Defendant Stellar reported an outstanding debt to a third party on July 28, 2014. **Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer pp. 40-41 L 16-20.**

5. Plaintiff Lakisha Smith received her bankruptcy discharge on August 12, 2014. **Plaintiff Complaint [Doc. 10], p. 6 ¶23.**

6. Defendant Stellar closed the Dish account for Plaintiff Smith due to Bankruptcy filing. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 15 L 12-24.**

7. Defendant Stellar began collection on a new and different account on behalf of Defendant Comcast. **Plaintiff Complaint [Doc. 10], p. 6 ¶26.**

- 2 -

8.  Plaintiff Smith is the owner of cell phone number 313-718-5938.  **Plaintiff Complaint [Doc. 10], p. 6 ¶27.**

9.  Defendant Stellar obtained Plaintiff Smith's cell phone number without Plaintiff Smith's prior consent by skiptracing vendor CBCInnovis.  **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer pp. 167-167.  Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer pp. 26-27 L 13-7; p. 28 L 13-15.**

10. Defendant Stellar incorrectly listed Plaintiff Smith's cell phone number as a home line.  **Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer p. 25 L 22-25.**

11. Defendant Stellar uses a company by the name of Livevox, Inc. to call its customers.  **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 139 L 16-18.**

12. Livevox's hardware and software data center for Defendant Stellar is located in New York City, a distance of 935 miles from Jacksonville, Florida according to google maps.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 10-11 L 16-10.**

13. Livevox's dialer has the capacity to dial numbers. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 118 L 21-25; p. 119 L 10-13.**

14. Defendant Stellar began its telephone RPC (Right Party Connect) campaign on Friday, July 18, 2014 at 2:48:31 PM.  **Exhibit I - Comcast Call Log.**

15. That the parties have stipulated the RPC (Right Party Connect) campaign used an ATDS (Automatic Telephone Dialing System).  **Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer p. 28 L 9-12.**

16. Livevox's HCI (Human Call Initiator) system became available to its customers in the first quarter of 2014, one year before the 2015 FCC Declaratory Ruling on the Telephone Consumer Protection Act. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 57 L 2-5; Exhibit F - FCC 2015 Declaratory Ruling and Order.**

17. Defendant Stellar began its telephone HCI campaign to Plaintiff's cell phone on Tuesday, August 12, 2014 at 4:46:19 PM. **Exhibit I - Comcast Call Log.**

18. According to the Comcast Call Log, Defendants called Plaintiff Smith's cell phone number 313-718-5938 a total of 31 times between July 18, 2014 through October 23, 2014. **Exhibit I - Comcast Call Log.  Exhibit G - Stellar Responses to Requests For Admission.**

19. According to the Metro PCS Call Log, Defendants called Plaintiff Smith's cell phone number 313-718-5938 a total of 49 times between July 18, 2014 through October 23, 2014. **Exhibit E - Metro PCS Call Log.**

20. One year after the filing of the instant lawsuit, Defendant Stellar even called Plaintiff Smith an additional four times on May 26, 2016; May 27, 2016; June 2, 2016; and June 6, 2016: **Exhibit J - Screenshots; Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer pp. 37-39 L 15-16.**

21. Each morning Defendant Stellar uploads 300,000 telephone numbers to the Livevox ATDS system to call daily. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer pp. 139-140 L 21-2; Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 10 L 6-11.**

22. These phone number uploads from Defendant Stellar are sent over the internet 935 miles from Jacksonville, Florida to New York City. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 13 L 8-19.**

23. Defendant Stellar agents remotely connect and use the Livevox ATDS dialing system located in New York City from their Jacksonville, Florida location. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 24 L 6-25.**

24. Livevox's dialer dials 250,000 to 300,000 numbers per day using its RPC (Right Party Connect) campaign and HCI (Human Call Initiator) campaign. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer pp. 141-142 L 21-1.**

25. Livevox's HCI (Human Call Initiator) system has the capacity to ring a certain number of times before disconnect. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 48-49 L 22-3.**

26. Livevox's HCI (Human Call Initiator) system dials 2,500 cell phone numbers per hour. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 142 L 2-5.**

27. Defendant Stellar employs persons called "clickers" whose sole purpose is to click on a number which appears on a monitor for the HCI (Human Call Initiator) system dialer. **Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer p. 30 L 11-19.**

28. These clickers' screens do not have a customer's account information such as names, notes, and account information. **Exhibit D - Deposition of Rachel Frady, Chief Compliance Officer pp. 29-30 L 20-5.**

29. Livevox's ATDS dialer system uses commercial-grade Dell servers.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 12 L 9-15; pp. 12-13 L 25-5.**

30. Livevox's dialer Campaign Database located in New York City has the capacity to store phone numbers.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 16-17 L 22-5; p. 18 L 12-15; p. 29 L 6-11.**

31. Livevox's dialer Automated Call Distributor (ACD) located in New York City has the capacity to store phone numbers.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 20-23 L 20-1; p. 29 L 6-11.**

32. Livevox's HCI (Human Call Initiator) system dialer platform is not a stand-alone system, but rather it needs the Automated Call Distributor (ACD), Media server Pool, and Campaign database to function.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 33-34 L 4-16; Exhibit B - Livevox Architecture Diagram of Dialing Systems.**

33. Livevox's Media Server Pool that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to detect and distinguish between a live person, a voicemail system, and an answering machine. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 40 L 13-21.**

34. Livevox's Media Server Pool that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to play music.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 47 L 2-8.**

35. Livevox's Media Server Pool that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to place customer on hold. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 48 L 13-21.**

36. Livevox's Media Server Pool that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to ring a certain number of times before disconnect. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 48-49 L 22-3.**

37. Livevox's dialing system that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to block outgoing calls to Canada. **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 50-51 L 24-10.**

38. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to do scheduled dialing. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 144 L 1-3.**

39. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to do predictive dialing. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 145 L 4-9.**

40. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to do broadcast Caller ID using area code 313 from Jacksonville, Florida. **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer pp. 94-95 L 19-1; Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 37 L 3-6.**

41. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to call during specific time zones. **Exhibit C - Deposition of Kendra**

**Vallarelli, Stellar Chief Analytics Officer pp. 113-114 L 22-3; Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 37-38 L 24-2.**

42. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to block numbers on the do not call list (DNC).  **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 114 L 18; Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 37-38 L 14-6.**

43. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) has the capacity to limit the frequency of calls to a specific customer.  **Exhibit C - Deposition of Kendra Vallarelli, Stellar Chief Analytics Officer p. 114 L 10-14.**

44. Livevox's dialer that is used in conjunction with the Livevox HCI (Human Call Initiator) have multiple backups for power.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 39 L 18-20.**

45. Livevox purchased and owns its dialing equipment.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management p. 25 L 10-15.**

46. Livevox has an excess of 20,000 telephone lines/trunks.  **Exhibit A - Deposition of Kevin Stark, Livevox Director of Product Management pp. 38-39 L 12-1.**

**STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).  The moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Cedillo v. Int'l Assoc. of Bridge &*

- 8 -

*Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10 (7th Cir, 1979).  The substantive law of the issues raised by the claims asserted in the complaint determines what is "material" for purposes of a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  By these standards, Plaintiff's motion for partial summary judgment should be granted.

**OVERVIEW OF THE TCPA**

The TCPA prohibits making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA creates a private right of action where a person may bring "an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater."  *Id.* § 227(b)(3)(B). "The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.,* 638 F.3d 768, 776 (11th Cir. 2011).

**A.     Automatic Telephone Dialing System**

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Federal Communications Commission ("FCC") under its rulemaking authority has declared that the TCPA includes equipment that has "the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 2003 WL

- 9 -

21517853, 18 F.C.C.R. 14014 ¶ 131 (Fed. Commc'n Cmm'n July 3, 2003). This is because the

basic function of such equipment is "the capacity to dial numbers without human intervention."

*Id.* ¶ 132. The FCC affirmed this definition of an ATDS in 2008. *In the Matter of Rules &*

*Regulations Implementing the Telephone Consumer Protection Act of 1991,* 2008 WL 65485, 23

F.C.C.R. 559 ¶ 12 (Fed Commc'n Cmm'n, Jan. 4, 2008).  The FCC reaffirmed this definition of

an ATDS again on July 10, 2015.  *In the Matter of Rules & Regulations Implementing the Tel.*

*Consumer Prot. Act of 1991*, CG02-278, ¶¶10-24 (OHMSV July 10, 2015).  In fact, the FCC

flatly rejected the notion by a debt collection industry trade group that the definition of an ATDS

excluded dialers that merely dialed from a list of consumers, as opposed to randomly or

sequentially.  *Id.* at ¶13. The FCC elaborated even further by stating,

> We agree that Congress intended a broad definition of autodialer, and that
> the Commission has already twice addressed the issue in 2003 and
> 2008, stating that autodialers need only have the "capacity" to dial random
> and sequential numbers, rather than the "present ability" to do so. Hence,
> any equipment that has the requisite "capacity" is an autodialer and is
> therefore subject to the TCPA.

*Id.* at ¶15.

### B.  Human Intervention

The FCC has rejected the argument that a dialer cannot be an autodialer unless it has the

capacity to dial numbers without "human intervention".

> In light of our precedent and determination that Congress intended a broad
> definition of autodialer, we reject arguments that: the TCPA's language on
> its face does not support the claim that the TCPA was meant to apply to
> devices that need to be configured to store numbers or call sequentially; a
> narrow reading of the TCPA is necessary to eliminate a lack of clarity
> regarding what constitutes an autodialer; and the term "capacity" implies
> present ability rather than future possibility.  We reiterate that a present use
> or present capacity test could render the TCPA's protections largely
> meaningless by ensuring that little or no modern dialing equipment would
> fit the statutory definition of an autodialer. We also reject PACE's
> argument that the Commission should adopt a "human intervention" test by

- 10 -

clarifying that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention. Because the Commission has previously rejected a restrictive interpretation of autodialer in favor of one based on a piece of equipment's potential ability, we find that PACE's argument amounts to a simple variation on the "present ability" arguments we reject above.

*Id.* at ¶20.

The FCC broad definition of an autodialer could arguably include smartphones.

PACE, TextMe, and others argue that a broad interpretation of "capacity" could potentially sweep in smartphones because they may have the capacity to store telephone numbers to be called and to dial such numbers through the use of an app or other software.  Even though the Commission has interpreted "capacity" broadly since well before consumers' widespread use of smartphones, there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology. Nor have these commenters offered any scenarios under which unwanted calls are likely to result from consumers' typical use of smartphones. We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer. We will continue to monitor our consumer complaints and other feedback, as well as private litigation, regarding atypical uses of smartphones, and provide additional clarification if necessary.

*Id.* at ¶21.

How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

Given the scope of the Petitioners' requests, we do not at this time address the exact contours of the "autodialer" definition or seek to determine comprehensively each type of equipment that falls within that definition that would be administrable industry-wide. Rather, we reiterate what the Commission has previously stated regarding the parameters of the definition of "autodialer." First, the Commission found in its original TCPA proceeding that the "prohibitions of [section] 227(b)(1) clearly do not apply to functions like 'speed dialing.'"66 Second, the Commission has also long held that the basic functions of an autodialer are to "dial

- 11 -

numbers without human intervention" and to "dial thousands of numbers in a short period of time." 67 How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

*Id.* at ¶17. In point of fact, there has been no dialing equipment using supposed "human intervention" to ever be excluded by the FCC as an autodialer.

### C.   Prior Express Consent As An Affirmative Defense

Defendants can avoid liability under 47 U.S.C. § 227(b)(1)(A)(iii) by proving that the Plaintiff gave the defendant "express consent" to call the cell phone with an automatic telephone dialing system. *Bates v. I.C. Sys.*, 2009 U.S. Dist. LEXIS 96488 (W.D.N.Y. Oct. 19, 2009). Proving express consent is an affirmative defense under the statute, and Defendant bears the burden of establishing it.[1]

Express consent under the TCPA is "[c]onsent that is clearly and unmistakably stated." *Black's Law Dictionary* 323 (8th ed. 2004). *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. Cal. 2009). The court in *Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010) (bold emphasis added) stated:

> Midland's call to Edeh's cellular phone **was permissible only if** it was made "with [Edeh's] **prior express consent**." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). "Express" means "explicit," not, as Midland seems to think, "implicit." Midland was not permitted to make an automated call to Edeh's cellular phone unless Edeh had previously said to Midland (or at least to Midland's predecessor in interest) something like

---

[1] *See: Grant v. Capital Mgmt. Servs., L.P.,* 449 Fed. Appx. 598, 600 (9th Cir. Cal. 2011)("'express consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof. See 23 F.C.C.R. 559, 565 (Dec. 28, 2007) ("[W]e conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent."); *Bates v. I.C. Sys.,* 2009 U.S. Dist. LEXIS 96488 (W.D.N.Y. Oct. 19, 2009); *Thrasher-Lyon v. Ill. Farmers Ins. Co.,* 2012 U.S. Dist. LEXIS 50560, 910 (N.D. Ill. Mar. 20, 2012); *D.G. v. Diversified Adjustment Serv., Inc.,* No. 112062, 2011 WL 5506078, at *3 (N.D. Ill. Oct. 18, 2011); *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716 (S.D. Tex. 2011); *Martin v. Bureau of Collection Recovery,* No. 107725, 2011 WL 2311869, at *1 (N.D. Ill. June 13, 2011)

this: "I give you permission to use an automatic telephone dialing system to call my cellular phone." Midland has no evidence that Edeh gave such express consent.

In, *Leckler v. Cashcall, Inc*., 554 F. Supp. 2d 1025, 1030 (N.D. Cal. 2008)("*Leckler I*" reversed for lack of jurisdiction by, 2008 U.S. Dist. LEXIS 97439), the Court analyzed the meaning of the "express consent" under the TCPA:

> Black's Law Dictionary defines "express consent" as "[t]hat directly given, either viva voice or in writing. It is positive, direct, unequivocal consent, requiring no inference or implication to supply its meaning." Black's Law Dictionary 276 (5th ed.1979). Similarly, it defines "express" as "[c]lear. Definite. Explicit. . . . Declared in terms; set forth in words. . . . Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct." *Id*. at 521. By contrast, "implied consent" is defined as "[t]hat manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption that the consent has been given." *Id*. at 276. Although the Court does not doubt that by providing her cell phone number on her loan application and in subsequent correspondence plaintiff consented to be called by defendant, such consent was implied through her actions and conduct, i.e. writing down her cell phone number in a space labeled for such information, rather than expressly given in words or "direct and appropriate language" explicitly stating that plaintiff consented to be called with an auto-dialer or prerecorded message.

The "express consent" that a consumer must give is the consent to be called by an auto-dialer.[2] The TCPA does not prohibit *manually dialed* calls to cell phones and there is no consent required to make these calls.[3] It is only the *automated process* of calling cell phones that is prohibited, so it is obviously *this* to which the consumer must expressly consent.[4]

---

[2] *See Thrasher-Lyon v. CCS Commer., LLC*, 2012 U.S. Dist. LEXIS 125203 (N.D. Ill. Sept. 4, 2012) ("One 'expresses' consent by, well, expressing it: stating that the other party can call, or checking a box on a form or agreeing to terms of service that explicitly permit automated telephone contact."); *Weitzner v. Iridex Corp*., 2006 U.S. Dist. LEXIS 44317, 12-13 (E.D.N.Y. June 29, 2006) and *Gottlieb v. Carnival Corp*., 595 F. Supp. 2d 212, 221-222 (E.D.N.Y. 2009) (both analyzing "express consent" in similar circumstance under the TCPA).

[3] *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 642 (7th Cir. Ill. 2012) (noting debt collectors don't need consent to call cell phones manually).

[4] *Thrasher-Lyon*, LEXIS 125203 at 16-17; *Leckler*, 554 F. Supp. 2d at 1030; *Edeh*, 748 F. Supp. 2d at 1038 (describing express consent as saying: "I give you permission to use an automatic telephone dialing system to call my cellular phone.")

- 13 -

### D.    Prior Express Consent Must be Given at the Time of the Transaction

Pursuant to the FCC's ruling *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd. 559, 565 (Jan. 4, 2008), "prior express consent is deemed granted only if the wireless telephone number was provided by the consumer to the creditor, and only if it was provided at the time of the transaction that resulted in the debt at issue." *Meyer*, 696 F.3d 943, 949, 2012 U.S. App. LEXIS 21136, **7-8, 83 Fed. R. Serv. 3d (Callaghan) 1039 (9th Cir. 2012) (citing *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd. 559, 564-65 (Jan. 4, 2008)).  "Thus, consumers who provide[] their cellular telephone number to creditors after the time of the original transaction are not deemed to have consented to be contacted at those numbers for purposes of the TCPA." *Id.*

### E.    Plaintiff Need Not Be Charged For The Autodialed Call

As a matter of statutory construction, and in considering Congressional intent, it is beyond cavil that Plaintiff need not incur charges for the illegal calls in order to establish a violation of the TCPA.  As the Court in *Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393 (N.D. Ohio 2012) recently noted:[5]

> …every court examining the pertinent language of the TCPA has

---

[5] See also: *Torres v. Nat'l Enter. Sys.*, 2012 U.S. Dist. LEXIS 110514 (N.D. Ill. Aug. 7, 2012); *Martin v. Leading Edge Recovery Solutions*, LLC, 2012 U.S. Dist. LEXIS 112795, 17-18 (N.D. Ill. Aug. 10, 2012); *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 729 (S.D. Tex. 2011); *Buslepp v. Improv Miami, Inc*., 2012 U.S. Dist. LEXIS 62489, 4-5 (S.D. Fla. May 4, 2012); *Abbas v. Selling Source, LLC,* 2009 U.S. Dist. LEXIS 116697, 6-7 (N.D. Ill. Dec. 14, 2009); *Lozano v. Twentieth Century Fox Film Corp*., 702 F. Supp. 2d 999, 1010 (N.D. Ill. 2010); *Mitchem v. Ill. Collection Serv*., 2010 U.S. Dist. LEXIS 76581 (N.D. Ill. July 29, 2010); *Kane v. Nat'l Action Fin. Servs*., 2011 U.S. Dist. LEXIS 141480, 21-22 ( E.D. Mich. Nov. 7, 2011); *Gutierrez v. Barclays Group*, 2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011); *Smith v. Microsoft Corp*., 2012 U.S. Dist. LEXIS 101197, 13-15 (S.D. Cal. July 20, 2012); *Silbaugh v. Omni Credit*, 2012 U.S. Dist. LEXIS 11175 (D. Md. Jan. 31, 2012).

concluded that a plaintiff does not have to prove that he was charged for a call to state a claim under the TCPA.

One of the stated purposes of the TCPA was also to prevent the invasion of privacy and nuisance resulting from automated calls to cell phones. *See Mims*, 132 S. Ct. at 745.[6]

### F.    Debt Collectors Must Comply with the TCPA

The TCPA's prohibition on the use of autodialers to call a cellular telephone number applies to debt collectors such as this Defendant. *See, e.g., In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Release number FCC 070232, 23 FCC Rcd 559, 565; 2008 FCC LEXIS 56; 43 Comm. Reg. (P & F) 877 (Jan. 4, 2008) ("ACA Declaratory Ruling"), at ¶ 11; *Soppet*, 679 F. 3d at 637-639, 642-43 ("The Commission concluded that the bill-collection industry does not need an exemption [to the TCPA] because § 227(b)(1)(A) already allows calls with the 'express consent' of the called party.").

### G.    Unanswered Calls Count As Violations

The TCPA makes it unlawful to place a call using its ATDS without prior express consent of the called party, regardless of whether the call was answered by a person, an answering machine, or not at all. *See Castro v. Green Tree Servicing LLC*, No. 10-cv-7211, 2013 WL 4105196, at *18 (S.D.N.Y. Aug. 14, 2013) ("[F]or purposes of Plaintiffs' TCPA claim, it is immaterial whether the Plaintiffs picked up all of Defendants' calls or whether several of the calls went unanswered."); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir.

---

[6] *See also Soppet,* 679 F.3d at 637; *Bonime v. Avaya, Inc.*, 547 F.3d 497, 499 (2d Cir. N.Y. 2008); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. Cal. 2009); *Smith v. Microsoft Corp.*, 2012 U.S. Dist. LEXIS 101197, 13-15 (S.D. Cal. July 20, 2012); *Martin v. Leading Edge Recovery Solutions, LLC,* 2012 U.S. Dist. LEXIS 112795, 14-15 (N.D. Ill. Aug. 10, 2012).

2009) (holding that "to call" in the TCPA means "to communicate with or *try to get in communication with* a person by telephone.") (emphasis added); *Fillichio v. M.R.S. Accocs.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) (The TCPA "does not include [] a requirement . . . that the recipient of a call must answer the phone or somehow be aware of the call in order for there to be a violation.").

### H.   Statutory Damages Under The TCPA

The TCPA is a strict liability statute. No intent need be shown to establish a violation.[7] The TCPA provides a private right of action and permits a successful Plaintiff to recover actual monetary loss for a violation of § 227(b)(1)(A). The TCPA provides that a Plaintiff shall receive actual damages for such violations "or $500 in damages for each such violation, whichever is greater."[8] The award of $500.00 per violation is a mandatory floor.[9]  In addition, the TCPA permits up to another $1,000.00 if the violation is deemed "willful or knowing" under the statute.[10]

### I.   Willful and Knowing Damages Under The TCPA

Courts are split on the exact meaning "willful or knowing" as contained in the TCPA.

---

[7] *Alea London Ltd. v. American Home Services, Inc.,* 638 F.3d 768, 776 (11 Cir. 2011) (quoting *Penzer v. Transp. Ins.Co.,* 545 F.3d 1303, 1311 (11th Cir. 2008)*); Harris v. World Fin. Network Nat'l Bank*, 2012 U.S. Dist. LEXIS 46882, 8-9 (E.D. Mich. Apr. 3, 2012); *Melrose Hotel Co. v. St Paul Fire and Marine Ins. Co*., 432 F.Supp.2d 488, 2006 TCPA Rep. 1640 (E.D.Pa. Apr. 19, 2006); *Park University Enterprises, Inc. v American Casualty Company of Reading, PA*, 314 F. Supp. 2d 104  (D. Kansas 2004).

[8] 47 U.S.C. §227(b)(3)(B); *Mims*, 132 S.Ct. at 740.

[9] *See Charvat v. NMP, LLC*, 2012 U.S. Dist. LEXIS 139505 (S.D. Ohio Sept. 27, 2012); *First Nat'l Collection Bureau, Inc. v. Walker*, 348 S.W.3d 329, 346 (Tex. App. Dallas 2011); *Fillichio v. M.R.S. Assocs*., 2010 U.S. Dist. LEXIS 112780, 11-13 (S.D. Fla. Oct. 19, 2010); *Chair King, Inc. v. Houston Cellular Corp*. 1995 WL 1693093 (S.D. Tex. Nov. 2, 1995); *Kopff v. Roth*, 2007 U.S. Dist. LEXIS 43702, 2007 WL 1748918, at *2 (D.D.C. June 15, 2007);  *Bransky v. Shahrokhi*, 2005 Ohio 97 (Ohio Ct. App., Cuyahoga County, Jan. 13, 2005).

[10] *See*, 47 U.S.C. §227(b); *Harris v. World Fin. Network Nat'l Bank*, 2012 U.S. Dist. LEXIS 46882, 8-9 (E.D. Mich. Apr. 3, 2012); *First Nat'l Collection Bureau, Inc. v. Walker*, 348 S.W.3d 329, 346 (Tex. App. Dallas 2011); *Stewart v. Regent Asset Mgmt. Solutions*, 2011 U.S. Dist. LEXIS 50046, 19-20 (N.D. Ga. May 4, 2011).

*Sengenberger v. Credit Control Servs.*, 2010 U.S. Dist. LEXIS 142528, 3-4 (N.D. Ill. June 17, 2010).  Under one approach, the Defendant need only intend to make the calls to the specific number using their auto-dialer.[11]  Under the other approach, a Defendant must have known about the TCPA prohibitions at issue before making the call.[12]  The first approach, requiring only that Defendants know they were making the call, appears to be the better approach as it is based solidly on statutory and U.S. Supreme Court authority. The Court in *Sengenberger*, noted:

> Courts may treble the damages award if the court finds that defendant's violations were committed "willfully or knowingly." 47 U.S.C. § 227(b)(3). Although neither the TCPA nor the FCC regulations define the terms "willfully or knowingly", courts have generally interpreted willfulness to imply only that an action was intentional. *Smith v. Wade*, 461 U.S. 30, 41 n.8, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). While the TCPA does not define willful, the Communications Act of 1943, of which the TCPA is a part, defines willful as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision, rule or regulation.

In *Charvat v. Ryan*, 116 Ohio St. 3d 394, 398 (Ohio 2007), the Ohio Supreme Court also found that the statute, and the US Supreme Court precedent controlling:

> "Knowingly" is undefined in the TCPA, but courts have often defined the term in criminal cases. *In Bryan v. United States* (1998), 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197, the United States Supreme Court explained that 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law. As Justice Jackson correctly observed, 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.' [*Boyce Motor Lines, Inc. v. United States* (1952), 342 U.S. 337, 345, 72 S.Ct. 329, 96 L. Ed. 367]

Finally, "'to establish a knowing violation of the TCPA for an award of treble damages, a

---

[11] *Sengenberger*, 2010 WL 1791270; *Stewart*, 2011 WL 1766018; *Charvat v. Ryan*, 116 Ohio St. 3d 394, 398 (Ohio 2007).

[12] *See Texas v. American Blastfax, Inc.*, 164 F.Supp.2d 892, 899–901 (W.D.Tex.2001); *Stern v. Bluestone*, 2008 NY Slip Op 611 (N.Y. App. Div. 1st Dep't 2008, reversed on other grounds by *Stern v. Bluestone*, 12 NY3d 873 (2009); *Kaplan v. First City Mortg.* 183 Misc.2d 24 (NY City Ct. 1999).  *Charvat*, *Blastfax*, *Bluestone*, and *Kaplan*, are "junk fax" cases. The TCPA's damages provision, 47 U.S.C. §227(b), applies to both illegal faxes as well as illegal calls to cell phones.

plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law.'" *Stewart v. Regent Asset Management Solutions, Inc.*, No. 1:10-CV-2552-CC-JFK, 2011 WL 1766018 at *7 (N.D. Ga. May 4, 2011) *quoting Charvat*, 879 N.E.2d at 770; *see also A Fast Sign Co., Inc. v. Am. Home Svcs., Inc.*, 747 SE2d 205. 208-09 (Ga. App. 2012).

## PLAINTIFF'S TELEPHONE CONSUMER PROTECTION ACT CLAIMS

### Defendant's TCPA Liability to Plaintiff

The facts are clear, Livevox's HCI platform used by Defendants is an ATDS autodialer and this case is ripe for summary judgment. The Federal Communications Commission ("FCC") with its rulemaking authority has set forth a broader definition of what constitutes an autodialer system in its most recent July 2015 ruling. The Administrative Orders Review Act (a/k/a the Hobbs Act) provides exclusive jurisdiction to the federal court of appeals to determine the validity of all final orders of the Federal Communications Commission (FCC). The FCC has flatly rejected arguments that a dialer cannot be an autodialer unless it has the capacity to dial numbers without "human intervention." How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG02-278, ¶¶15 and 17. (OHMSV July 10, 2015).

### The HCI Dialing Equipment

Livevox's HCI platform consists of multiple pieces of equipment located in New York City. **SUF ¶¶** 30-31. The Livevox HCI platform needs various hardware to function. **SUF ¶¶** 32. The Livevox HCI platform needs the Automatic Call Distributor (ACD) and without the

ACD the HCI platform will not function. **SUF ¶¶** 32. The Automatic Call Distributor (ACD) has the capacity to store numbers. **SUF ¶¶** 31. Therefore, this system devised by vendor Liveox, and used by these Defendants, irrefutably meets the TCPA's definition of "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). There is no reasoned argument by Defendants that the Livevox HCI platform dials numbers. The evidence is also undisputed that Plaintiff's cell phone was repeatedly called using the Livevox HCI platform.

A brief review of the Livevox HCI system capabilities is in order: The Livevox HCI platform depends entirely upon the Livevox Media server Pool (MSP) to function. **SUF ¶¶** 32. The MSP has the capacity to detect a live person, distinguish voicemails and answering machines, play music, place customers on hold, and ring a certain number of times before disconnecting. **SUF ¶¶** 33-36. Livevox's dialer system uses commercial-grade Dell servers. **SUF ¶¶** 29. Livevox's dialer system has the capacity to block outgoing calls to Canada; capacity to do scheduled dialing; capacity to do predictive dialing; capacity to do broadcast Caller ID using area code 313 when not in the 313 area code; capacity to call during specific time zones; capacity to block numbers on the do not call list (DNC); and, capacity to limit the frequency of calls to a specific customer. **SUF ¶¶** 37-43. Livevox purchased this dialing equipment, and they own this dialing equipment. **SUF ¶¶** 45. Livevox's dialers have multiple backups for power. **SUF ¶¶** 44. Finally, Livevox has an excess of 20,000 telephone lines/trunks. **SUF ¶¶** 46.

**<u>The "Clicker agents"</u>**

Defendant Stellar employs persons as "clicker agents" whose sole employment purpose is to click on a telephone number that flashes on a monitor screen for the HCI (Human Call Initiator)

system dialer to begin its automated dialing process.  **SUF ¶¶** 27-28.  The monitor screen used by the "Clicker agents" shows only the customer's telephone number.  **SUF ¶¶** 28.  The monitor screen has no account information.  **SUF ¶¶** 28.  The monitor screen has no customer names.  **SUF ¶¶** 28.  The monitor screen has no account notes.  **SUF ¶¶** 28.  The monitor screen has no account information such as the number of times the customer has been called in a given day.  **SUF ¶¶** 28.  There is no information as to whether a Stellar agent is available to accept customer call.  **SUF ¶¶** 28.  The "Clicker agents" click on 2,500 cell phone numbers per hour. **SUF ¶¶** 26.

To summarize, the Defendant's clicker agents sit all day and blindly click as many as 20,000 random telephone numbers delivered onto their flashing screens over an eight-hour shift.  The telephone numbers are fed to them by an automated Livevox server, over which they have exercised absolutely no discretion or control, only to have those telephone numbers thereafter automatically dialed by another Livevox server, before being later automatically connected to a waiting collection agent—so long as that Livevox system electronically determined that the answerer was a human being and not a voicemail system.  In other words, Defendant's multi-server, multi-state, multi-platform, multi-software, automated telephone dialing system is a textbook example of an ATDS under the FCC's rulings.

**<u>Human Intervention</u>**

The FCC necessarily intended that the "human intervention" that was to be considered must necessarily be *material* and *meaningful* intervention.  It can hardly be argued that a human tapping a keyboard for eight hours a day, in order to defeat the autodialing strictures of the TCPA is the type of legitimate human intervention that the FCC cited in its July 2015 order.  Rather, in promulgating its regulations, the FCC could not have reasonably intended the human intervention element to simply mean that an otherwise automated system could evade the

- 20 -

definition of an ATDS simply by the insertion of a human *action,* such as mindlessly depressing a space bar on a keyboard, as opposed to a true human *intervention*. Instead, this Court may presume that the FCC undertook its rulemaking process in a serious and considered fashion. The case-by-case analysis of human intervention that the FCC referenced in its 2015 Order referred not to mindless, casual, or happenstance human actions, but rather actual human intervention. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG02-278, ¶¶15 and 17. (OHMSV July 10, 2015). The intervention by a human must be meaningful, deliberative, and material, *e.g.*, individually analyzing and selecting which telephone numbers to dial; dialing them; and, speaking with the person on the other end of the phone. To find otherwise would be to elevate form over function.

Automated systems have always involved some level of human action in their operation. Human intervention means the *stoppage* of a process rather than the effectuation of it (*think*: medical intervention, military intervention, alcohol intervention, or playground intervention). In this case, Defendants will argue that their dialer system is not an automated system because it's designed to inject a human action to continue it. This is the opposite of human intervention, and rather it is the human *facilitation* of that automated system. That Defendant has chosen to insert this human action to continue the automated process that its automated system started does not make this system non-automated. No one would reasonably argue that a Ferris wheel is a not an automated system, simply because an operator started its flow of operation with a single push of a button.

The evidence is clear: Defendant's automated computer dialing system selected the numbers to dial, presented them on a flashing screen, a human tapped a keyboard, and the automated system thereafter dialed the preprogrammed telephone number which was stored by

that computer system.  The human in the middle of this automated process exercised no judgment, analysis, or input on which phone numbers to call.  This is in no way the type of "human intervention" discussed by the FCC in its July 2015 Order that might remove Defendant's telephone dialing system from the definition of an ATDS, as Defendants hoped.  A human tapping a key does not remove the fundamentally automated nature of Defendant's automated telephone dialing system.  The FCC's directive that a case-by-case analysis was necessary to determine whether human intervention for a dialing system is a recognition that *all* automated systems involve *some* level of human action in order to start, stop, or continue them.  It is the fundamental nature of our machines—but it does not remove them from the realm of automation.

In the instant case, the best Defendants can argue is that the human actuation initiates the automation of the dialing system rather than defines it.  Defendants have injected a human action (a key tap) in an effort to avoid liability under the TCPA.  An ON/OFF switch function such as that provided by the Livevox HCI dialer system does not prove that a device is non-automated, rather it proves that it is.  Livevox employees themselves have publicly acknowledged that its HCI is "technology" and that it is a system designed to increase dialer system contacts by ten times.  See Exhibit 11 - LinkedIn Profile of Mr. Tyler Parisi.  The insertion of human intervention by Defendants and Livevox are designed to distract from the true functionality of the Livevox HCI telephone dialing system and thereby redefine the FCC's definition of an ATDS.  One court's recent analysis of the problem is very illuminating in this regard:

> In a parting shot, *Collecto* contends that even if the court yields to the finality of the FCC Orders, the Noble and GC Dialers do not fit within the definition of an ATDS because the dialers are, to a degree, dependent on human intervention. [FN9]  The short answer is that the FCC's definition of an ATDS is based on the capacity of a dialer to operate without human intervention, and not on whether *some* act of human agency occurs at some point in the process. [FN10]

- 22 -

*In re Collecto, Inc.,* 2016 WL 552459, at *4 (D. Mass., 2016).

-------------------------------------------------------------

[FN 9] In the cases Collecto cites in support of its argument, human intervention was required to *dial* the target telephones, not simply to activate the process (by assembling a list of numbers and uploading them to the dialer). *See Luna v. Shac*, 2015 WL 4941781, at *5 (N.D. Cal. Aug. 19, 2015) (finding that human intervention "was involved in several stages of the process ... including ... clicking 'send' on the website to transmit the message to Plaintiff."); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1193-1194 (W.D. Wash. 2014) (finding that to dial and transmit dispatch notification to a taxi, "the dispatcher must have pressed 'enter' to transmit ... information to both the TaxiMagic program and the nearest available driver.").

[FN 10] As plaintiffs observe, "[e]very ATDS requires some initial act of human agency – be it turning on the machine or pressing 'Go.' It does not follow, however, that every subsequent call the machine dials – or message it sends – is a product of that human intervention." *Johnson v. Yahoo!, Inc.*, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014); *see also Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 225-226 (D. Mass. 2014) (Saylor, J.) (citing the FCC's finding that "[t]he basic function of such equipment ... [is] the capacity to dial numbers without human intervention" and finding that the FCC's Orders were entitled to deference). The parties dispute (principally through dueling experts) whether the Noble and Guaranteed Contacts Dialers fit the FCC's additional defining feature of a predictive dialer – specifically, whether it has the *capacity* "to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." 18 FCC Rcd. at 14091.

**CONCLUSION**

There is no material issue of disputed fact regarding whether Defendant autodialed Plaintiff's cellular telephone 53 times without her prior express consent.  Likewise, there is no material dispute of fact that Defendants' HCI dialer is an ATDS.  There is no material dispute of fact that Defendants' actions in this case were "willful or knowing."  By any standard, Defendants' actions and omissions in robodialing were willful or knowing.[13]  As there are no

-------------------------------------------------------------

[13] *See J2 Global Communs., Inc. v. Blue Jay, Inc.*, 2009 U.S. Dist. LEXIS 111609 (N.D. Cal. Aug. 4, 2009) ("The Court need not decide in the instant case whether knowledge of the law is required before a treble damages award may be made under the TCPA. Under either standard -- *i.e.*, knowingly violating the TCPA or simply knowingly sending an unsolicited communication -- the Court concludes that a treble damages award is proper in the instant case.")

contested facts, the Court should rule as a matter of law that the Defendants acted "willfully or knowingly."[14]

Moreover, the undisputed evidence is overwhelming that Defendants violated the Plaintiff's right to privacy in its unjustified robodialing conduct toward her. The Court should also rule, as a matter of law, that Defendants violated Plaintiff's right to privacy as well, and grant summary judgment to her on those counts of the Complaint as well.

Finally, Plaintiff is entitled to a trial by jury on the question of punitive damages.

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Honorable Court grant her motion for partial summary judgment and provide the following relief:

- award the Plaintiff $26,500 statutory damages under 47 USC § 227(b)(3) (53 autodialer call violations at $500 each);

- deem Defendant's actions "willful or knowing" under the TCPA;

- award the Plaintiff $53,000 treble damages under 47 USC § 227(b)(3) (53 autodialer call "willful and knowing" violations at $1,000 each);

- grant Plaintiff summary judgment on her invasion of privacy claims;

- enjoin Defendant from further violations of the TCPA and from further invasions of Plaintiff's privacy;

- award Plaintiff's reasonable attorney fees for her invasion of privacy;

- allow Plaintiff to recover punitive damages at trial by jury; and

---

[14] *See Sengenberger v. Credit Control Servs.*, 2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010)("There is no dispute as to whether Defendants intentionally made the contested phone calls to Plaintiff. Defendants have put forth no facts to contest the assertion that any of the nine disputed phone calls were made willfully or knowingly. Accordingly, I find that Defendants knowingly and willfully made the phone calls.")

- grant such other and further relief as is appropriate under the circumstances.

Respectfully submitted,

/s/ Stephen A. Thomas

July 12, 2016                    STEPHEN A. THOMAS P43260
                                Attorney for Plaintiff
                                645 Griswold St., Suite 1360
                                Detroit, Michigan  48226
                                313-965-2265
                                sthomas@313965bank.com

## Certificate of Service

I, Stephen A. Thomas, hereby state that on July 12, 2016, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

/s/ Stephen A. Thomas

July 12, 2016                    STEPHEN A. THOMAS P43260
                                Attorney for Plaintiff