# EXHIBIT B

June 14, 2016 Deposition Transcript of Rachel Frady,

Chief Compliance Officer of Defendant Stellar Recovery, Inc.

UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

Civil Action No. 2:15-CV-11717-SJM-MKM

LAKISHA T. SMITH,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
STELLAR RECOVERY, INC., et al.,      )
                                     )
            Defendants.              )
                                     )

DEPOSITION OF

RACHEL FRADY

Taken on behalf of the Plaintiff


DATE:          Tuesday, June 14, 2016

TIME:          10:16 a.m. to 11:04 a.m.

LOCATION:      Jacksonville Area Legal Aid
               127 West Adams Street
               7th Floor Conference Room
               Jacksonville, Florida 32202


Examination of the witness taken before:
Heather Manazir, RPR, FPR,
and Notary Public in and for the State of Florida


JACKSONVILLE COURT REPORTING, INC.
POST OFFICE BOX 5675
JACKSONVILLE, FLORIDA 32247
(904) 743-5791

```
 1                    A P P E A R A N C E S

 2

 3

 4      On behalf of the Plaintiff:

 5            STEPHEN A. THOMAS, Esquire
              645 Griswold Street, Suite 1360
 6            Detroit, Michigan 48226
              (313) 965-BANK (2265)
 7            sthomas@313965BANK.com

 8

 9

10      On behalf of the Defendant:

11            ALISON EMERY, Esquire
              Assurance Law Group
12            3731 Hendricks Avenue
              Jacksonville, Florida 32207
13            (904) 497-4904
              alison@assurancelawgroup.com
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3               E X A M I N A T I O N S

 4   WITNESS                                    PAGE

 5     RACHEL FRADY

 6        DIRECT EXAMINATION BY MR. THOMAS............4

 7

 8                    E X H I B I T S

 9   FOR IDENTIFICATION:

10     PLAINTIFF'S EXHIBIT 7..........................24

11     PLAINTIFF'S EXHIBIT 8..........................11

12     PLAINTIFF'S EXHIBIT 9..........................7

13     PLAINTIFF'S EXHIBIT 10.........................37

14     PLAINTIFF'S EXHIBIT 11.........................38

15     PLAINTIFF'S EXHIBIT 12.........................39

16     PLAINTIFF'S EXHIBIT 13.........................39

17

18

19

20

21

22

23

24

25
```

```
 1                    S T I P U L A T I O N

 2          It was stipulated and agreed by and between

 3   counsel for the respective parties, and the witness,

 4   that the reading and signing of the deposition by the

 5   witness was waived.

 6                         -   -   -

 7          THE COURT REPORTER:  Ma'am, would you raise

 8      your right hand, please?

 9          Do you swear or affirm that the testimony you

10      are about to give will be the truth?

11          THE WITNESS:  Yes.

12          THE COURT REPORTER:  Thank you.

13                         -   -   -

14                       RACHEL FRADY,

15   having been produced and first duly sworn as a witness,

16   testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. THOMAS:

19      Q    I'm attorney Stephen Thomas, and I represent

20   the plaintiff in this matter, Lakisha Smith.

21          What is your name?

22      A    Rachel Frady.

23      Q    Okay.  And spell your last name.

24      A    F-r-a-d-y.

25      Q    Okay.  You understand you're under oath, right?
```

Jacksonville Court Reporting, Inc.

```
 1       A     Yes, sir.

 2       Q     Okay.  And let me ask you a few preliminary

 3  questions.

 4             Today, you're not under any influence of

 5  medication, drugs, or alcohol that would prevent you

 6  from testifying truthfully today?

 7       A     No, sir.

 8       Q     And when I ask a question, and you're able to

 9  give an answer, I'm going to assume that you heard the

10  question and that you understood the question, if you're

11  able to give the answer --

12       A     Okay.

13       Q     -- is that fair enough?

14       A     Yes, sir.

15       Q     You live here in Jackson [sic]?

16       A     Yes.

17       Q     All your life?

18       A     Since I was five.

19       Q     Since you were five?

20       A     Uh-huh.

21       Q     Fair enough to me.

22             How old are you now?

23       A     31.

24       Q     31.  In the last ten years, have you been

25  convicted of a felony?
```

```
 1        A     No.
 2        Q     What's your highest level of education?
 3        A     High school.
 4        Q     And that was here in Jackson --
 5        A     Yes.
 6        Q     -- Jacksonville?
 7              Where do you work now?
 8        A     Stellar Recovery.
 9        Q     How long have you worked for Stellar Recovery?
10        A     Three years as of October of this year, so a
11   little over two-and-a-half years.
12        Q     Okay.  What's your title now?
13        A     Chief compliance officer.
14        Q     Chief compliant [sic] officer.  Had you always
15   been chief compliance officer?
16        A     No, sir.
17        Q     When you first got to Stellar, what was your
18   position?
19        A     Director of quality assurance.
20        Q     Where did you work before Stellar?
21        A     Enhanced Recovery Company.
22        Q     How many years had you worked there?
23        A     Ten years.
24        Q     Okay.  So you had a little experience before
25   you got over to Stellar about collection?
```

```
 1        A     Yes, sir.

 2        Q     Now, your position now, what -- say it again.

 3   What is it?

 4        A     Chief compliance officer.

 5        Q     Chief compliance officer.  What are your duties

 6   as chief compliance officer?

 7        A     Multiple things.  I ensure our collectors and

 8   our policies and procedures are compliant with federal

 9   regulations, client regulations.  That's my main focus.

10            (Plaintiff's Exhibit 9 was marked for

11   identification.)

12   BY MR. THOMAS:

13        Q     Okay.  I'm showing you what has been previously

14   marked as -- as Plaintiff's Exhibit Number 9.

15            MR. THOMAS:  I've got one for you.  Keep it.

16        That's yours to keep.

17            MS. EMERY:  Okay.  Thanks, Stephen.

18   BY MR. THOMAS:

19        Q     All right.

20        A     (Reviewing document.)

21        Q     Do you recognize that?

22        A     I don't recognize it, but I can read what it

23   is.

24        Q     Okay.  What is it?

25        A     It looks like the contract between Stellar and
```

```
 1  Comcast.
 2      Q    Okay.  On the very first page, paragraph two,
 3  compliance with applicable laws and security
 4  standards --
 5      A    Uh-huh.
 6      Q    -- do you see that?
 7      A    Uh-huh.
 8      Q    Is that a yes?
 9      A    Yes.
10      Q    Just for her.
11      A    Yes.  Sorry.
12      Q    You don't have to apologize.  Just --
13           MS. EMERY:  It's hard for her to type a head
14      nod.
15           THE WITNESS:  Uh-huh.
16           MR. THOMAS:  Yeah.
17  BY MR. THOMAS:
18      Q    Could you read the first sentence?
19      A    In providing the services hereunder, vendor
20  hereby agrees to comply with all applicable laws,
21  including, without limitation, the federal Fair Debt
22  Collection Practices Act.
23      Q    All right.  And what does that mean to you, as
24  compliance -- chief of compliance?
25      A    It means that Stellar will here -- adhere to
```

```
 1  the FDCPA.
 2      Q    Okay.  And, in your own words, what is the
 3  FDCPA?
 4      A    It's what governs collection agencies to ensure
 5  best business practices.
 6      Q    All right.  Could you give me an example of a
 7  violation of the FDCPA?
 8      A    I mean, I guess it could -- it -- it could
 9  depend on if -- the FDCPA is not very clear all the
10  time.
11      Q    Okay.
12      A    A violation could be, you know, harassment, I
13  guess you could say.
14      Q    Harassment.  Okay.  Anything else?
15      A    There's -- FDCPA is very broad, and I think we
16  could go on for all day, if you want to, talking about
17  possible violations.
18      Q    Well, let's go on --
19      A    And I guess I'm not --
20      Q    -- to that.
21      A    -- exactly sure what you're asking.
22      Q    I'm asking you, as compliance officer --
23      A    Uh-huh.
24      Q    -- chief compliance officer, give me all the
25  violations that you know.
```

```
 1        A      Uh-huh.

 2        Q      You indicated one is harassment.

 3        A      Uh-huh.

 4        Q      Anything else?

 5        A      Continuing -- continuing to call if not asked.

 6        Q      Right.

 7        A      Charging fees in states that don't allow fees.

 8   There's multiple.  Do you want me to list every

 9   single --

10        Q      Please.

11               MS. EMERY:  To the extent that -- object to the

12        form; to the extent you know, to the extent you can

13        do that.

14               MR. THOMAS:  Are you trying to coach somebody

15        over here?

16               MS. EMERY:  No.  You're asking her to cite the

17        whole FDCPA.  Can you?

18        A      Yeah.  It's -- it's -- the FDCPA is -- is huge.

19   I'm -- I'll just tell you --

20   BY MR. THOMAS:

21        Q      There's only -- you've only given three.  Is

22   that the only three that you know?

23        A      No, it's not the only three that I know.  But

24   it's the only three that I could tell you off the top of

25   my head.
```

1      Q     Fair enough.  So those are the only three that
2  you could tell me off the top of your head --
3      A     Yes.
4      Q     -- correct?
5            MS. EMERY:  Object to the form.
6  BY MR. THOMAS:
7      Q     All right.  Let me ask you this.
8      A     Uh-huh.
9      Q     Would -- would contacting a consumer after a
10 bankruptcy has -- has discharged debt --
11     A     Yes.
12     Q     -- would that be a violation?
13     A     Yes.
14     Q     Okay.  What about calling a consumer in
15 attempts to collect a debt, when the debt had been part
16 -- previously discharged in bankruptcy?  Would that be a
17 violation?
18     A     Yes.
19          (Plaintiff's Exhibit 8 was marked for
20 identification.)
21 BY MR. THOMAS:
22     Q     Okay.  I'm handing you what has been previously
23 marked as Plaintiff's Exhibit 8.
24     A     Do you want these ones back, or just keeping
25 them to the side?

```
 1              MS. EMERY:  Keep them there for the court
 2        reporter.
 3              THE WITNESS:  Okay.
 4              MR. THOMAS:  I've got to get you one of them.
 5              MS. EMERY:  Yeah, if you have one.
 6              MR. THOMAS:  I have one.
 7              MS. EMERY:  You gave me --
 8              MR. THOMAS:  Looking at --
 9              MS. EMERY:  -- you gave me -- you gave me two.
10              MR. THOMAS:  Yeah.
11              MS. EMERY:  Well, I think it's the same thing.
12              MR. THOMAS:  All right.
13   BY MR. THOMAS:
14        Q    Looking at Exhibit 8, do you recognize what
15   that is?
16        A    Yes.
17        Q    And what is that?
18        A    It's an account history report from our
19   collection software.
20        Q    Okay.  And that -- would that collection
21   software be Latitude?
22        A    Yes, sir.
23        Q    When was this report generated?
24        A    Report date says 12/3/2015.
25        Q    And would this be a -- and would this be a
```

Jacksonville Court Reporting, Inc.

1  business record?

2      A    Can you define business record?

3      Q    A record that would be kept in the normal

4  course of business.

5      A    Yes, sir.

6      Q    All right.  And would you agree with me that

7  this business record, Exhibit 8, is a true and fair

8  representation of the activ- -- account history for

9  Lakisha Smith?

10      A    Yes, sir.

11      Q    All right.  Now, let's -- let's take a look at

12  Exhibit 8.  Let me ask you a few questions on it.

13          When is the first -- strike that.

14          Let's start at the very top.  What is the ID

15  number?

16      A    The account ID?

17      Q    Our account ID.

18      A    That is Stellar Recovery's file number for this

19  account.  It's our unique file number.

20      Q    Okay.  And that would be 12884152, correct?

21      A    Yes, sir.

22      Q    And what's the status, RCL?  What does that

23  mean?

24      A    Recall.  That means the account has been closed

25  and returned to the client.

1      Q      Okay.  And account number, what would -- no,
2   no.  Customer.  Let's do that line.  What's that?
3      A      Comcast.  That is the -- the account that this
4   is.
5      Q      And abbreviation would be the COMCA?
6      A      Yes.
7      Q      And that account number, what is that?  Is that
8   the Comcast number?
9      A      That's Comcast's specific account number --
10     Q      Okay.
11     A      -- that was assigned.
12     Q      And that would be 01 -- strike that --
13  0610539067506, correct?
14     A      Yes.
15     Q      And it -- it says, Next received.  And the
16  date, what date is that?
17     A      That's the date that Stellar Recovery received
18  the account from Comcast in our office.
19     Q      Okay.  And what date is that?
20     A      6/21/2014.
21     Q      All right.  And it indicates that it was
22  closed?
23     A      Yes.
24     Q      Does that mean that it was closed out as far as
25  Stellar, or does it mean Comcast closed it out?

```
 1      A     That means --

 2      Q     Tell me what that means.

 3      A     -- Stellar Recovery closed the account.

 4      Q     Okay.  And what date would that be?

 5      A     7/29/2015.

 6      Q     And returned, what date is that?

 7      A     7/29/2015.

 8      Q     Does that mean that it was returned back to

 9  Comcast?

10      A     Yes, sir.

11      Q     Why was it closed out on 7/29/15?

12      A     One second.

13      Q     Yeah.  Take your time.

14      A     It looks like it was a final recall, meaning

15  that the account was placed in our office for the

16  duration of time assigned, and it was closed because of

17  that.

18      Q     What are you looking at to indicate that it was

19  for a duration of time?

20      A     It's -- it says on 7/29/2015, Received a final

21  recall, closing and returning.

22      Q     What -- what page are you on?

23      A     That's page four of five.  It's on the 7/29

24  note, second to the bottom.

25      Q     Okay.  What about the line for 7/14/2015, the
```

Jacksonville Court Reporting, Inc.

```
 1    -- the line that has RL under the two -- well, I believe
 2    that's your action, and result is CO.  What -- what does
 3    that mean?
 4              MS. EMERY:  I think you mean 7 -- 5/14.
 5         There's no 7/14 entry.
 6    BY MR. THOMAS:
 7         Q    5/14.
 8         A    What does what mean?  There's a --
 9         Q    The line.  The line that has the RL --
10         A    CO?
11         Q    -- and the CO, correct.
12         A    That means we received a letter, and this is a
13    comment only.  And if -- if you read the note, we
14    received a lawsuit for calling consumer after BK.
15         Q    All right.
16         A    So that's just our notation to the account that
17    that was received.
18         Q    So would that be the reason why the account was
19    closed out?
20         A    No.
21         Q    Okay.  Was there any phone calls to the -- to
22    Lakisha Smith or letter sent after that notation?
23         A    No.
24         Q    Okay.  Going back to page one of five, there's
25    many entries for 6/21/2014, correct?
```

1    A    Yes, sir.

2    Q    All right.  And the first line, it indicates,

3  Account -- account received from client.

4    A    Yes.

5    Q    That started it all, correct?

6    A    Yes, sir.

7    Q    Next line, Phone information has been updated

8  from client.

9         What does that mean?

10   A    It means that when the account was received,

11 that there was a phone number that came with the

12 account, and it was updated to the account.

13   Q    All right.  Then going down, skipping the blank

14 line, the same information, correct?

15   A    Yes.

16   Q    Then, Miscellaneous extra data added, what --

17 what does that reflect?

18   A    It's another data field for the account.  It's

19 just miscell- -- miscellaneous information, and it shows

20 where a service address was added to the account of the

21 13097 Longview Street.

22   Q    Would that be where the Comcast account would

23 -- would have been?

24   A    Yes, service address.

25   Q    All right.  And the next line, it says,

1  Disconnect reason, and -- and has an N.  What does that

2  mean?

3     A    I'm not sure what the N means.

4     Q    Do you know who might know what the N means?

5     A    Possibly, Comcast.

6     Q    And the next line, Deposit amount zero?

7     A    Yes.

8     Q    What does that mean?

9     A    I don't know.

10    Q    All right.  And the customer type, Residential?

11    A    Yes.

12    Q    As opposed to a business, correct?

13    A    Correct.

14    Q    And the next line, Dwelling type one.

15         What's a Dwelling type one?

16    A    I don't know.

17    Q    And the next line, Tax ID type, Social Security

18 number.

19         Would SSA -- SSN mean Social Security number?

20    A    Yes, sir.

21    Q    All right.  What is the region entity Detroit?

22 That means that's where it's located?

23    A    Yes.

24    Q    Now, it said, File sent to IDA for litigious

25 debtor scrub.

```
 1            What does that mean?
 2      A    It's a scrub that we do to see if this
 3 consumer's previously had any litigation.  It's just
 4 that's what that states.
 5      Q    And the next line, Account sent to TLO for
 6 bankruptcy-deceased scrub.
 7            What -- what does TLO mean?
 8      A    Transunion.  It's a vendor that we use to do
 9 our bankruptcy-deceased scrubs.
10      Q    Backing up to IDA, what -- what company is
11 that?
12      A    They've changed their names several times.  I
13 don't know what the acronym stands for.  It's now IDI.
14 I don't know.
15      Q    Would that be the same company that you --
16 that's your vendor now, as it was back in June?
17      A    Yes.  We do still use them.
18      Q    Okay.  And Exchange, what does that mean?
19      A    Exchange, that's the system, the interface that
20 we use when downloading information.  It's just where
21 it's going through to load to the account.
22      Q    Explain the next line where there's, Fusion,
23 the send and send and the actual result line.  Read the
24 comment.  Explain that to me.
25      A    ID info two service data ordered on 6/22/2014.
```

```
 1            It's just for the -- the TLO that you see
 2   above.  It's just showing that we ordered bankruptcy
 3   scrub and deceased scrub.
 4        Q    Now, do you know, are you aware that Ms. --
 5   Ms. Smith filed bankruptcy back in -- in May of 2014, I
 6   believe it is?
 7        A    I'm aware because of this case.
 8        Q    Okay.  So she filed bankruptcy prior to you --
 9   you getting the -- the account, correct?
10        A    Yes.
11        Q    All right.  And -- and your reason for
12   contacting her -- you do agree you did contact her after
13   a bankruptcy, correct?
14        A    Yes, sir.
15        Q    And why is that?
16        A    We did a bankruptcy scrub, and because of the
17   Social Security number on file, ending in 5694, it did
18   not identify a bankruptcy.
19        Q    Where did you get the Social Security number,
20   5694?
21        A    It was received from Comcast in the file when
22   we got the account on 6/21/2014.
23        Q    Okay.  So you don't know whether or not
24   Ms. Smith provided the 5694 Social Security number,
25   correct?
```

1    A    I would assume that she provided that phone

2 [sic] number.

3    Q    Why -- why would you assume that?

4    A    I don't know where else Comcast would have got

5 that Social Security number.

6    Q    What -- what proofs or evidence would you show

7 a jury that Ms. Smith provided Social Security 5694 to

8 Comcast?

9    A    I don't have any proof, other than every other

10 single account that we receive from Comcast comes with a

11 Social Security number in the file that's received from

12 the customer.  I would like to think that Comcast isn't

13 making up Social Security numbers for consumers.

14    Q    So it's fair to say you have no proof?

15    A    Correct.

16    Q    All right.  Now, going to the next line, we

17 already talked about the -- the scrub for previous

18 litigation, correct?  We did that?

19    A    Yes, sir.

20    Q    Okay.  Let's talk about that scrub for that

21 phone number, (313) 523-2310.  Do you see that line?

22    A    Yes.

23    Q    Okay.  What's that all about?

24    A    File sent to IDA for cell phone scrub for cell

25 phone number.

```
 1              It means that we're sending the phone number to
 2      our -- our scrub vendor to determine the phone type for
 3      this phone number.
 4          Q    Why is that important?
 5          A    We like to know the type of phone number to
 6      make sure that we're complying with calling.
 7          Q    Explain that.
 8          A    If it's a cell phone, we'd call HCI, human
 9      intervention, and if it's -- it wasn't, we would have a
10      different dialing method.
11          Q    What would that dialing method be?
12          A    It would be our RPC dialer.
13          Q    So HCI is for -- stands for Human Call
14      Initiator?
15          A    Yes, sir.
16          Q    Okay.  And the RPC, so we know what we're
17      talking about, is the Right Party Connect?
18          A    Yes, sir.
19                   (Cell phone interruption.)
20              MR. THOMAS:  Excuse me.  Excuse me.  Thank you.
21      BY MR. THOMAS:
22          Q    And, now, the next line in the case, Scrub for
23      phone number (949) 154-1313, correct?
24          A    Yes.
25          Q    Would that be the same thing, looking to see
```

```
 1   whether or not it's a cell phone or a landline?

 2       A    Yes, sir.

 3       Q    What were the results of those two scrubs, the

 4   first one for the 313 area code, (313) 523-2310?

 5       A    One second.  It's appears that it resulted in a

 6   match, and the phone number was updated to a cell due to

 7   match.

 8       Q    And the next one, the (949) 154-1313?

 9       A    Sorry.  I'm trying to find that notation.  I

10   don't see where that was returned.  I don't know if it's

11   due to the -- it doesn't appear to be a valid telephone

12   number.

13       Q    So in your records, you -- you have a incorrect

14   number, phone number, it would appear?

15       A    It appears.

16       Q    Okay.  Just like it appears that the Social

17   Security number is incorrect, correct?

18       A    Yes.

19       Q    All right.  Now, the line 23/14, the 6:37,

20   Fusion, send, send, Innovis, RPC, tell me about that

21   one.  Read it, and then tell me -- explain it to me.

22       A    Fusion, send, Innovis RPC service data ordered,

23   I'm not exactly sure what that means.

24       Q    Okay.  The next line is a home number,

25   (313) 918-7482, and that was added as a home number?
```

```
 1        A     Yes, sir.

 2        Q     So what system would you use to contact that?

 3   Would that be the RPC?

 4        A     Yes, sir.

 5        Q     The next line, (313) 718-5938 added, and it

 6   says home, correct?

 7        A     Yes, sir.

 8        Q     And so that would be RPC as well, correct?

 9        A     Correct.

10        Q     And that -- that phone number is Lakisha Smith

11   cell phone, correct?

12              MS. EMERY:  Object to the form.

13        A     I don't know.

14        Q     You don't know?

15        A     (Shakes head.)

16              (Plaintiff's Exhibit 7 was marked for

17   identification.)

18   BY MR. THOMAS:

19        Q     I'm showing you what has been previously marked

20   as Exhibit -- Plaintiff's Exhibit 7, and let the record

21   reflect that that is Mrs. Smith's metroPCS call log.

22              And do you see the incoming call on the first

23   line on 7/18/2014, destination number (313) 718-5938?

24        A     Yes.

25        Q     Do you see that?
```

Jacksonville Court Reporting, Inc.

```
 1      A    Yes, sir.
 2      Q    Would you agree with me that that's a cell
 3 phone number?
 4           MS. EMERY:  Object to the form.
 5      A    I guess.  I don't -- this isn't --
 6 BY MR. THOMAS:
 7      Q    All right.
 8      A    -- this isn't my record, so I don't know for
 9 this to be --
10      Q    Okay.  I don't want you to guess.  If you -- if
11 you don't know, that's fine.
12           MS. EMERY:  Steve, we're not -- I don't think
13      we're disputing that that's her cell phone, if that
14      helps.
15           MR. THOMAS:  All right.
16           MS. EMERY:  That way you don't have to ask her
17      if she agrees that's her cell phone number.  We'll
18      stipulate that that's her cell phone number.
19           MR. THOMAS:  Fair enough.  Moving on.
20           MS. EMERY:  Yes.
21 BY MR. THOMAS:
22      Q    Okay.  Based on that stipulation, that that is
23 Lakisha Smith's cell phone number, but it's listed in
24 your notes as a home line, correct?
25      A    Yes.
```

1       Q      Why is that?

2       A      I can't tell you why that is.

3       Q      Going to page two of five, are you familiar

4    with that?  Do you see it?

5       A      What page?  Yes.

6       Q      Two of five.

7       A      Yes.

8       Q      LiveVox began the campaign on June 25th, 2014,

9    correct?

10      A      What date?

11      Q      June 25th, 2014.

12      A      Correct.  Yes.

13      Q      All right.  How did Stellar get the number that

14   we just stipulated, (313) 718-5938?  How did they get

15   that number?

16      A      From a scrub.

17      Q      Okay.  What -- what scrub?  And explain, show

18   me.

19      A      A skip tracing that's --

20      Q      Where are you -- where are you referring to in

21   the notes that will show us a skip trace?

22      A      I just see where the number was added, so --

23      Q      What -- where would that be?

24      A      Page one of five.

25      Q      Yes.

```
 1      A    On the 6/23 note at 8:02 p.m.

 2      Q    Added, and you got it from a -- from a skip

 3  trace?

 4      A    Yes, sir.

 5      Q    Okay.  So Ms. Smith did not provide that

 6  number?

 7      A    You are correct.

 8      Q    And let's -- let's go back to page two of five

 9  when the campaign started.

10           Where was the first time, based on the

11  campaign, that you contacted Ms. Smith using LiveVox?

12      A    Like an actual contact or just an attempt?

13      Q    Attempt on the -- that cell phone number.

14      A    One second.

15      Q    Take your time.

16      A    It appears 7/18.

17      Q    2014?

18      A    Yes, sir.

19      Q    And the time, what time?

20      A    12:48 p.m.

21      Q    So that's the first contact, based on your

22  records, right?

23      A    Yes, sir.

24      Q    And there was no answer, correct?

25      A    Correct.
```

```
 1        Q     What campaign was used for that phone call?

 2        A     It says, RPC AM- -- AMDOCS, under score,

 3   seconds.

 4        Q     What -- what does that mean?

 5        A     It's the name of the campaign.

 6        Q     Okay.  So you agree with me that that was a

 7   call to a cell phone, correct?

 8        A     Yes.

 9        Q     Based upon that -- that campaign, RPC, we

10   stipulated that that was automatic telephone dialing

11   system, correct?

12        A     Yes.

13        Q     And you did not have the plaintiff's consent to

14   call her on that number, correct?

15        A     Correct.  I will say, however, though, that the

16   actual phone records could be different than what this

17   says.  I'm just throwing that out there.

18              MR. THOMAS:  I'll move to strike as

19        nonresponsive.

20   BY MR. THOMAS:

21        Q     Now, the campaign moved from a RPC to a HCI,

22   correct?

23        A     Are we talking about the 5938 phone number?

24        Q     Yes.  Only -- only going to talk about the 5938

25   number for purposes of this deposition.  Okay?
```

1      A      Yes, sir.

2      Q      All right.  How about August 13th?

3      A      Yes.

4      Q      All right.  So why did the campaign change from

5  a Right Party Connect to a Human Contact Initiator

6  campaign?

7      A      I -- I don't know.

8      Q      Okay.  Now, the Human Contact Initiator, that

9  campaign, it would involve, on your end, uploading

10  numbers in a file to -- to LiveVox, correct?

11            MS. EMERY:  Object to the form.

12      A      I'm not the dialer.

13  BY MR. THOMAS:

14      Q      Okay.

15      A      I -- I don't know how the dialer runs.

16      Q      All right.  Do you know how the -- is it -- is

17  it not true that the Human Contact Initiator would --

18  would click a button on the screen?

19      A      That's correct.

20      Q      Okay.  And on that screen there's no names,

21  correct?

22      A      It's a telephone number.

23      Q      A telephone number?

24      A      Yes.

25      Q      But no names?

```
 1       A    Correct.

 2       Q    Okay.  And there's no notes, correct?

 3       A    Correct.

 4       Q    And there's no account information, correct?

 5       A    Correct.

 6       Q    Such as, We've already called this person five

 7  times today; there's no information like that?

 8       A    No.  But there's logic on our dialer that

 9  wouldn't allow an account to load up if dialed five

10  times.

11       Q    Okay.  But there's nothing on the -- on the --

12  on the clicker -- clicker -- what do you -- what do you

13  call the person who does the actually clicking?

14       A    We -- we refer to them as clickers.

15       Q    Clickers?

16       A    Uh-huh.

17       Q    Okay.  So for the purpose of the deposition,

18  we're going to refer to them as clickers.

19       A    That's fine.

20       Q    How many clickers work at Stellar Recovery?

21            MS. EMERY:  Object to the form.

22       A    I don't know.

23  BY MR. THOMAS:

24       Q    Have you ever observed a clicker working?

25       A    Uh-huh.  Yes.
```

Jacksonville Court Reporting, Inc.

```
 1      Q    Okay.  What do they do?

 2      A    They click phone records.

 3      Q    That -- that number we're talking about?

 4      A    Correct.

 5      Q    On the screen?

 6      A    Yes.

 7      Q    Do they do anything else?

 8      A    They also -- they collect accounts and --

 9      Q    But as they're -- they're doing their clicking

10   duty?

11      A    No.  It's -- it's separate.

12      Q    Okay.  So --

13      A    They have times, designated times.

14      Q    Okay.  So there's a designated time that --

15   that the clicker is only clicking numbers?

16      A    Correct.

17      Q    Okay.  Not taking calls?

18      A    Correct.

19           MS. EMERY:  I'm going to object to the form.

20           Can you just specify the time period for her,

21      please?

22   BY MR. THOMAS:

23      Q    What time period were you referring to in your

24   answer?

25      A    As recent as this month.
```

1    Q    Okay.

2         MR. THOMAS:  Is that fine?

3         MS. EMERY:  I think so.  But the system --

4    let's go off the record for a minute.

5         MR. THOMAS:  Okay.  Definitely.

6              (Discussion off the record.)

7         MR. THOMAS:  Back on the record.

8  BY MR. THOMAS:

9    Q    Back in 2014, it was a clicker clicking the

10 number?

11   A    Yes, sir.

12   Q    All right.  Going back to Exhibit Number 9, is

13 that the contract?

14   A    Yes.

15   Q    Okay.  The second page, I know they're not

16 numbered, but it would be under Performance

17 Requirements, 5, and then 5.3, the first line reads, To

18 the extent that vendor is authorized by client to gain

19 remote access to perform the obligations as under the

20 contract.

21        So you had -- you had access to Comcast's

22 system for Lakisha to collect on, correct?

23   A    No.

24   Q    Okay.  Going back to Exhibit Number 8, I want

25 to go to page three of five.  And -- oh, no, let's --

```
 1  let's back up.
 2            On two of five, who is -- who is CRUPD?
 3       A    What date is that?
 4       Q    That'll be at the bottom portion under the
 5  column for action.  It's CRUPD.
 6       A    That's just a user.  It's -- it's not an actual
 7  person.  It's when we upload a file to the credit
 8  bureau.
 9       Q    Who's that -- who's that person?
10       A    It isn't a person.  That's just --
11       Q    That's not a person's name?
12       A    No.
13       Q    Okay.  Okay.
14            Let's -- let's go ahead and go to page three of
15  five.  And I want to call your attention to the -- the
16  August 25th, 2014, at 2:40 p.m.
17            Do you see that line?
18       A    Yes.
19       Q    Who is Jen Grove?
20       A    She would have been a collector.
21       Q    Do you know her?
22       A    No.
23       Q    Is it fair to say she doesn't work there now?
24       A    I don't know.
25       Q    She could have worked there; you just don't
```

 1  know?

 2      A     I don't know if she still currently works

 3  there.  I know if her notes are in the account, yes, she

 4  absolutely worked there at that day at that time.

 5      Q     Okay.

 6      A     I don't know if she still works for us.

 7      Q     Fair enough.  While we're on the same subject,

 8  there's a B. Smith that appears on four of five.

 9            Who is B. Smith?

10      A     She's Belinda Smith.

11      Q     Okay.  Does Belinda Smith still work with

12  Stellar?

13      A     No.

14      Q     Is there a -- is there a high turnover rate for

15  the collectors?

16      A     Yes.

17      Q     And when you say high turnover rate, what do

18  you mean by that?

19      A     It's -- it's probably -- I would want to say --

20  I couldn't give you the actual percentage.

21      Q     Please.

22      A     I -- I don't know the actual percentage.

23      Q     Oh, you don't.  Okay.

24      A     But it's a -- it's a high turnover rate.

25      Q     A high turnover rate?

```
 1      A    Yes.

 2      Q    Why do you think so?

 3      A    It's just the industry.

 4      Q    Stressful?

 5      A    I wouldn't say it's because it's stressful.

 6      Q    Low pay?

 7      A    I wouldn't say because it's low pay.

 8      Q    What do you say?

 9           MS. EMERY:  Object to the form.

10      A    It's not a career for them.  It's a call

11 center.  It's not just collections.  It's -- most call

12 centers, if you look at -- research call center turnover

13 rates, it's not just collections.

14 BY MR. THOMAS:

15      Q    Fair enough.  Going back to page three of five.

16 Are you on that page, ma'am?

17      A    No.  I am now.

18      Q    Okay.  And that August 25th, 2014, that Jen

19 Grove --

20      A    Yes.

21      Q    -- it says in the comments section, Mail return

22 set on debtor.

23           What is -- what's that?  What's that all about?

24      A    As -- it appears as though she marked the

25 address as bad.
```

1    Q    She marked the -- what do you mean by that,
2  please?
3    A    She made the address to be a bad address on our
4  system of record.
5    Q    I -- I'm not following.  Just it's --
6    A    So she made -- there's a -- I guess, to be very
7  detailed, there's a button on Latitude that says, Good
8  address.
9         And if you click it, it'll change to bad
10  address, if as that is not a good address for Lakisha
11  Smith.
12    Q    So is that what happened here?
13    A    Yes.
14    Q    She just hit the wrong button?
15         MS. EMERY:  Object to the form.
16    A    I don't know if she hit the wrong button.  I'm
17  telling you that's the button that she hit.  I don't
18  know if it was the wrong button.
19  BY MR. THOMAS:
20    Q    Okay.  Did Stellar, in fact, send a letter to
21  Ms. Smith?
22    A    Yes.
23         MR. THOMAS:  Okay.  Can we go off the record,
24    please?
25              (Discussion off the record.)

Jacksonville Court Reporting, Inc.

```
 1              MR. THOMAS:  Okay.  Back on the record.
 2   BY MR. THOMAS:
 3       Q    Okay.  The campaign closed -- based on
 4   Exhibit 8, it was closed on July 29th, 2015, correct?
 5       A    The account?
 6       Q    The account.
 7       A    Yes, sir.
 8       Q    So there -- there should have been no contact
 9   after that point with Lakisha Smith on this account,
10   correct?
11       A     On this account, yes.
12            (Plaintiff's Exhibit 10 was marked for
13   identification.)
14   BY MR. THOMAS:
15       Q    Okay.  I'm showing you what's been previously
16   marked as Plaintiff's Exhibit 10.  And I'll represent to
17   you that's a screen shot from Lakisha Smith, showing
18   that Stellar contacted her on June the 6th, 2016, this
19   year, a little over a week ago, eight days ago.
20            Do you know why Stellar would call my client on
21   her cell phone eight days ago?
22       A    Yes.
23       Q    Why would they call her on her cell phone eight
24   days ago?
25       A    There was an account placed in our office with
```

```
 1   someone else's name that was associated to this
 2   telephone number, so we weren't calling for Lakisha
 3   Smith.
 4       Q    Let -- let -- let -- okay.
 5            Who -- who -- when you attempted to make this
 6   call on June -- or May the -- made the call on June the
 7   6th of this year, who were you attempting to contact?
 8       A    I don't know the name off the top of my head.
 9       Q    Do you have any account notes that would
10   reflect this?
11       A    Yes.
12            MR. THOMAS:  I'm going to go off the record
13       once again.
14                 (Discussion off the record.)
15            MR. THOMAS:  Okay.  Back on the record.
16            MS. EMERY:  I can, you know -- I can -- the
17       best I can do is give you, you know, the information
18       that we received associated with this phone number.
19            (Plaintiff's Exhibit 11 was marked for
20   identification.)
21   BY MR. THOMAS:
22       Q    Showing you Exhibit 11.  Based on your prior
23   testimony, would you agree that Stellar contacted my
24   client on June -- June the 2nd on her cell phone?
25       A    Yes.  Based off this screen shot, yes.
```

1          MR. THOMAS:  Okay.  What was that now --

2          (Plaintiff's Exhibit 12 was marked for

3  identification.)

4  BY MR. THOMAS:

5      Q     I'm showing you what has been previously marked

6  as Plaintiff's Exhibit 12.  Would you agree with me that

7  Stellar contacted my client on her cell phone on

8  May 27th of this year?

9      A     Yes.

10         (Plaintiff's Exhibit 13 was marked for

11  identification.)

12  BY MR. THOMAS:

13     Q     And showing you Exhibit 13.  Would you agree

14  that Stellar contacted my client on her cell phone on

15  May 26th of this year at 4:05 p.m.?

16     A     Yes.

17     Q     Okay.  You can hand all those back to me, the

18  screen shots.

19         What system was used, what campaign was used to

20  contact my client in the recent weeks?

21     A     I don't know.  I don't have that information in

22  front of me.

23     Q     Can you get that for me?

24     A     Yes.

25     Q     Okay.  So would it be fair to say it would be

 1 either Right Party Connect or it would be a Human Call

 2 Initiator?

 3     A    Yes, sir.

 4     Q    Are those the only two campaigns that Stellar

 5 uses?

 6     A    No.

 7     Q    What other campaigns?

 8     A    Quick Connect, which is like RPC.

 9          MS. EMERY:  Can we go off the record for a

10     second?

11          MR. THOMAS:  Yeah.

12               (Discussion off the record.)

13          MR. THOMAS:  There was an entry that -- back on

14     the record again.

15 BY MR. THOMAS:

16     Q    There was an entry that Stellar made a report

17 to Lakisha Smith's credit report.

18     A    Yes.

19     Q    When -- when was that?

20     A    7/28/2014.

21     Q    And that would have been after she had filed

22 bankruptcy, correct?

23     A    Yes.

24     Q    And what -- what notation -- well, what

25 information was submitted to the credit bureaus?

```
 1      A     What do you -- I'm sorry.  What do you mean?
 2      Q     Okay.  Reading, it says, Open collection
 3  account submitted in credit bureau report file.
 4            What information would have been submitted to
 5  or in credit bureau report file?
 6      A     It would have been the balance, the customer
 7  name, our reference number.
 8      Q     And that -- that -- that she was -- she owed
 9  500 and --
10      A     $19.71, yes.
11      Q     That would have been submitted to the bureaus?
12      A     Yes, sir.
13      Q     On that date and time?
14      A     Yes, sir.
15      Q     All three?
16      A     Yes, sir.
17      Q     The three majors?
18      A     Yes, sir.
19      Q     And -- and -- and what are the three majors?
20      A     Transunion, Equifax, and Experian.
21            MR. THOMAS:  I have no further questions.
22      Thank you.
23            MS. EMERY:  I don't have any.
24            THE COURT REPORTER:  Read or waive?
25            MS. EMERY:  Can I keep these?  Because I don't
```

```
1      have any.
2            MR. THOMAS:  I'll make sure the court reporter
3      gets them.
4            Thank you for your time.
5            THE WITNESS:  You're welcome.  Thank you.
6            THE COURT REPORTER:  Read or waive?
7            THE WITNESS:  I'm sorry?
8            THE COURT REPORTER:  Read or waive?
9            MS. EMERY:  We'll waive.
10                   (Witness excused.)
11         (Deposition was concluded at 11:04 a.m.)
12                       -   -   -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3   STATE OF FLORIDA)

 4   COUNTY OF DUVAL )

 5

 6          I, Heather Manazir, a Notary Public in and for

 7   the State of Florida at Large, do hereby certify that,

 8   pursuant to Subpoena to Testify at a Deposition in a

 9   Civil Action in the above-entitled cause, I sat at

10   Jacksonville Area Legal Aid, Inc., 126 West Adams

11   Street, Jacksonville, Duval County, Florida, Florida, at

12   the time stated hereinabove, and was attended by STEPHEN

13   A. THOMAS, Esquire, 645 Griswold Street, Suite 1360,

14   Detroit, Michigan, attorney for the Plaintiff; ALISON

15   EMERY, Esquire, of the law firm of Assurance Law Group,

16   3731 Hendricks Avenue, Jacksonville, Florida, attorney

17   for the Defendant; and the witness, RACHEL FRADY, who

18   was first duly sworn to testify the truth and was

19   carefully examined, thereupon testified as is

20   hereinabove shown, and that the testimony of the said

21   witness and proceedings herein were reduced to

22   typewriting under my personal supervision and are a true

23   and correct copy of my stenographic notes and electronic

24   recording.

25          I further certify that pursuant to stipulation
```

Jacksonville Court Reporting, Inc.

```
 1  by and among counsel for the respective parties, and by

 2  the witness, that the reading and signing of the

 3  deposition were waived.

 4          I further certify that I am neither of counsel

 5  nor attorney to either of the parties in said cause nor

 6  interested in the event of the said cause.

 7          I further certify that I have delivered the

 8  original of said deposition to STEPHEN A. THOMAS,

 9  Esquire, 645 Griswold Street, Suite 1360, Detroit,

10  Michigan, attorney for the Plaintiff, for his

11  safekeeping.

12

13          WITNESS my hand and official seal this 27th day

14  of June, 2016.

15

16

17

18                  Heather Manazir, RPR, FPR
                    Notary Public - State of Florida
19                  My Commission expires:  8/14/2018
                    My Commission No.:  FF 129393
20

21          Personally Known

22          Professionally Known

23
        X   Produced Identification of Work Picture ID Card
24          (Driver's License not provided per Counsel for
              Defendant)
25
```

Jacksonville Court Reporting, Inc.