# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **COLETTE JENKINS,** | |
| **Plaintiff,** | |
| v. | 1:14-cv-2791-WSD |
| **MGAGE, LLC and LL ATLANTA, LLC d/b/a OPERA NIGHTCLUB,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Colette Jenkins's ("Plaintiff") Motion for Summary Judgment [34] ("Plaintiff's Motion") and Defendants mGage, LLC ("mGage") and LL Atlanta, LLC d/b/a Opera Nightclub's ("Opera") (together, "Defendants") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment on Intentionality [37] ("Defendants' Motion"). Also before the Court are mGage's Motion for Partial Summary Judgment [36] ("mGage's Motion"), Plaintiff's Motion to Strike mGage's Motion [47], and Plaintiff's "Motion for Leave to File Plaintiff's Statement of Facts (Out-of-Time)" [54] ("Motion for Leave").

## I. BACKGROUND

### A. Summary

This is an action for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA"), which prohibits using an automatic telephone dialing system ("ATDS") to send a text message to a cellular telephone for other than emergency purposes or without the recipient's prior express consent. See 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff maintains that, from August 2013 through July 2014, Defendants used an ATDS to send Plaintiff approximately 150 text messages promoting events at a nightclub operated by Opera. Plaintiff argues that she did not consent to receiving the text messages and that she continued to receive them even after she told Defendants seventeen (17) times to stop sending her text messages. Defendants contend they did not employ an ATDS, including because the text messages were sent only as the result of human intervention.

### B. mGage's Platform

Defendant mGage is a mobile marketing company that provides content routing services for corporate customers. (Defs.' Statement of Material Facts [42]

("DSOMF") ¶¶ 3, 7-8, 14).[1] mGage provides a platform (the "Platform") with which a customer, such as Opera, may interact to send text messages to recipients. (Id. ¶ 7). Opera is a night club that had a contract with mGage. Under the contract, Opera had a license to utilize mGage's Platform to transmit promotional text messages to its customers. (Id. ¶¶ 12-13, 17-18). Opera used mGage's Platform to send the promotional text messages as issue in this case. (See id. ¶ 22).

To send promotional text messages, an mGage customer, such as Opera, must navigate to a website and log into mGage's Platform. (See id. ¶¶ 63-65).[2] Once logged in, an Opera employee must type the content of the text message into the Platform. (Id. ¶ 70). Opera employees determined the content of each text message, (id. ¶ 67), and typed the contents of the text message into the Platform, (id. ¶ 70). After entering the text message content into the Platform, the Platform allowed Opera employees to choose when to send out the text message. (Id. ¶ 71). If the employee wanted to send the text messages immediately, the employee clicked the "send" button. (Id. ¶ 73). The employee could also use the drop-down

---

[1] Unless otherwise noted, Plaintiff admits the facts in Defendant's Statement of Material Facts recited below. (See Pl.'s Resp. to DSOMF [43] ("PRDSOMF")).
[2] Plaintiff denies that an Opera employee, Rosanna Penaflorida, created and sent out promotional text messages to Opera's customers using mGage's Platform. Plaintiff fails to cite any evidence in the record to support her denial.

3

calendar function on the Platform to schedule a later date and time at which a text message would be sent. (Id. ¶¶ 71-74).

Opera determined the telephone numbers to which text messages were sent. (Id. ¶ 76).[3] It did so by choosing a particular list of numbers that was housed on mGage's Platform. (Id. ¶ 77). Opera employees uploaded the list of numbers to the Platform as a Common Separated Values ("CSV") file. (Id. ¶ 78). The numbers in the CSV file were obtained by promotional campaigns that asked individuals to text a certain keyword or phrase to 67372, Opera's short code. When an individual texted the keyword or phrase to the short code, their number was added to the list that corresponded to the promotional campaign. (Id. ¶ 81). Each keyword or phrase was placed on a different list, so the customer could sign up and get information about different events, for example a college night event or

---

[3] Plaintiff denies this assertion, stating "Opera did not know to whom or to what telephone numbers its messages were being sent, as all of those numbers were stored on the text messaging system in a CSV file." (PRDSOFM ¶ 76). The deposition testimony Plaintiff relies on in support of her position is not persuasive. Ms. Penaflorida testified that there were between 10,000 and 50,000 numbers on the list of telephone numbers to which Opera sent texts, and that it was "[p]retty easy" to remove a telephone number from the list. (Dep. of Rosanna Penaflorida [34.4] ("Penaflorida Dep.") at 18, 20). This testimony does not support that Opera did not know to whom or to what telephone numbers its messages were sent. Moreover, the testimony of Harvey Scholl, mGage's Rule 30(b)(6) witness, supports that Platform users like Opera compile and control the telephone numbers in the CSV file. (Dep. of Harvey Scholl [38.5] ("Scholl Dep.") at 19-21).

an electronic music night.  (Id. ¶¶ 82, 83).  Opera also manually uploaded telephone numbers to the Platform when individuals added their number to a list on Opera's website, or on a guest list form.  (Id. ¶ 85).

    C.    <u>Text Messages to Plaintiff</u>

On September 26, 2012, an individual used a mobile device assigned a number ending in 2763 to text the word "college" to Opera's short code.  (Id. ¶ 118).  Around April 2013, the telephone number was reassigned to Plaintiff.  (Id. ¶ 119).  Around August 2013, Plaintiff began receiving text messages advertising Opera's upcoming events.  (Id. ¶ 121).  She continued receiving text messages from Opera's short code through July 2014.  (Id. ¶ 122).  Plaintiff sent multiple text messages asking to be removed from Opera's promotional text message list.  (Id. ¶ 123).  On July 14, 2014, Plaintiff responded "STOP TEXT" to Opera's short code.  (Id. ¶ 124).  The final message Plaintiff received from Opera's short code stated, "You have been opted out of Opera Nightclub Alerts and will no longer receive messages from us.  Reply HELP for help.  Msg&Data rates may apply."  (Id. ¶ 125).

    D.    <u>Procedural History</u>

On August 28, 2014, Plaintiff filed this action, alleging violations of the TCPA.  Plaintiff seeks statutory damages, actual damages, treble damages, costs,

5

and interest. (Am. Compl. [15] at 10). On August 31, 2015, Plaintiff filed her Motion. In it, she seeks summary judgment, arguing that "[t]here is no dispute that Defendant sent numerous, non-emergency text messages using an automated telephone dialing system to the cellular telephone of Plaintiff . . . ." ([34] at 14). Plaintiff incorporated a statement of material facts into the "Factual Background" section of her brief in support of her Motion. She did not include with her Motion the separate statement of material facts required by the Court's Local Rules. See L.R. 56.1(B), NDGa. In response to Plaintiff's Motion, Defendant argues Plaintiff's Motion should be denied, including because of Plaintiff's failure to file the separate statement of undisputed facts that the Court's Local Rules require.

On August 31, 2015, Defendant mGage filed its Motion. mGage seeks partial summary judgment, arguing it cannot be held liable for any violations of the TCPA that occurred prior to January 4, 2014—the date upon which mGage purchased Velti, the company that owned the Platform Opera used to send text messages. In response, Plaintiff seeks to strike mGage's Motion, arguing that it relies on documents that were not produced to Plaintiff.

On September 1, 2015, Defendants moved for summary judgment. In the Motion, they argue, among other things, that Plaintiff fails to show that Defendants employed an ATDS, including because the text messages were sent only as the

6

result of human intervention. Defendants also seek partial summary judgment on Plaintiff's claim for treble damages, arguing that Plaintiff fails to show Defendants intentionally ignored Plaintiff's requests to stop sending text messages.

On October 21, 2015, Plaintiff filed her Motion for Leave to file her separate statement of material facts out-of-time. Defendants oppose the motion.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

7

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

8

B.  Discussion

The crux of the parties' dispute is whether the Platform is an ATDS under the TCPA. Defendants claim a key feature of an ATDS is the capacity to dial numbers or send text messages without human intervention. Defendants argue that, because the Platform requires several steps to be performed by a human, it is not an ATDS. Plaintiff contends that orders promulgated by the Federal Communications Commission ("FCC") support that the Platform is an ATDS.

The TCPA provides that it is "unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1). "The term 'automatic telephone dialing system' means equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1).

The Hobbs Act, 28 U.S.C. § 2342(1), "provides the federal courts of appeals with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to

9

determine the validity' of FCC orders." Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1306-1307 (11th Cir. 2015) (quoting 28 U.S.C. § 2342(1)). "District courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation . . . ." Id. Accordingly, "a district court must afford FCC final orders deference and may only consider whether the alleged action violates FCC rules or regulations." Id.[4]

When the TCPA was passed, telemarketers used dialing equipment to create and dial arbitrary 10-digit phone numbers. Smith v. Markone Fin., LLC, No. 3:13-CV-933-J-32MCR, 2015 WL 419005, at *2 (M.D. Fla. Feb. 2, 2015) (citing 18 FCC Rcd. 14014 ¶ 132 (July 3, 2003) ("2003 FCC Order")). Around the turn of the century, however, it became more cost effective for the teleservices industry to use lists of numbers. Id. The important factor, the capacity to dial numbers without human intervention, remained the same. Id. In 2003, in the face of these technological advances, the FCC considered the application of the TCPA's definition of an ATDS to what are called "predictive dialers." A predictive dialer is "hardware, when paired with certain software, [which] has the capacity to store

---

[4] The Court notes the TCPA's prohibition on automated dialing applies to voice calls and text messages. See 27 FCC Rcd. 15391 ¶ 2 (Nov. 26, 2012); see also Legg v. Voice Media Grp., Inc., 20 F. Supp. 1370, 1373 (S.D. Fla. 2014) (citing Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 269 n.2 (3d Cir. 2013)).

10

or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." 18 FCC Rcd. 14014 ¶ 131 (July 3, 2003). The FCC noted that "[t]he basic function of such equipment . . . [is] the capacity to dial numbers without human intervention." Id. ¶ 132 (emphasis omitted). It concluded that "predictive dialers . . . fall[] within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." Id. ¶ 133.

In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." 23 FCC Rcd. 559 ¶ 12 (Jan. 4, 2008) ("2008 FCC Order"). In 2012, the FCC emphasized that the definition of autodialer "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers are randomly or sequentially generated or come from calling lists." 27 FCC Rcd. 15391 ¶ 2 n.5 (Nov. 29, 2012) (emphasis in original).

On June 18, 2015, the FCC issued a declaratory ruling and order reiterating "that the basic functions of an autodialer are to dial numbers without human intervention . . ." 30 FCC Rcd. 7961 ¶ 17 (July 10, 2015) ("2015 FCC Order"). The FCC clarified: "How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how

11

the equipment functions and depends on human intervention, and is therefore a case-by-case determination." Id. The 2015 FCC Order also provides that, "even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition." Id. ¶ 12. The 2015 FCC Order includes "Internet-to-phone text messaging technology" in the definition of "automatic telephone dialing system," reasoning that, "[s]o long as the initiating device has the requisite capacity to meet the statutory definition of an autodialer and send a text message . . . the fact that the message is initiated from a phone versus some other device is not relevant." Id. ¶¶ 111 & n.379.

"[T]hrough these implementing regulations, the FCC has indicated that the definition of ATDS now includes 'predictive dialers,' which may dial numbers from preprogrammed lists rather than generate numbers randomly or sequentially." Luna v. Shac, LLC, 122 F. Supp. 3d 936, 939 (N.D. Cal. 2015). "Accordingly, the fact that [Defendants' Platform] has the ability to send text messages from preprogrammed lists, rather than randomly or sequentially, does not disqualify it as an ATDS." Id.

Defendants argue they are entitled to summary judgment because the text messages were sent as the result of human intervention, and thus were not sent by an autodialer. In support of their argument, they rely primarily on the Northern

District of California's decision in Luna. In Luna, the court granted summary judgment to a defendant that sent text messages using a web-based system very similar to the Platform at issue here. In reaching its conclusion, the Luna court, after thoroughly reviewing the FCC's 2003, 2008, and 2015 Orders, noted the FCC has "indicated that the defining characteristic of an autodialer is the capacity to dial numbers without human intervention." Id. at 940 (internal quotation marks omitted). Turning to the system operated by the defendant, the Luna court observed that "human intervention was involved in several stages of the process prior to Plaintiff's receipt of the text message, including transferring the number into the CallFire database, drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff." Id. The court concluded the text messages at issue were sent as a result of human intervention, and granted summary judgment in favor of defendant. Id. at 941-42.

Here, the same types of human intervention were required to send the text messages to Plaintiff. It is undisputed that, to send promotional messages, an Opera employee had to: (i) navigate to a website; (ii) log into the Platform; (iii) determine the content of the text message; (iv) type the content of the text message into the Platform; (iv) determine whether to send the text message immediately or to schedule a later date to send the message; (v) either click "send"

13

to send the message immediately, or take action to select a later date and time to send the message by using a drop-down calendar function.  (See DSOMF ¶¶ 63-65, 67, 70, 71-74).  Opera also determined the telephone numbers to which text messages were sent by an employee choosing a particular list of numbers and uploading the list to mGage's Platform as a CSV file.  (Id. ¶¶ 76-78).

Plaintiff attempts to distinguish Luna.[5]  Plaintiff first argues the texting system in Luna "required an employee to manually type a phone number into the website, or manually uploading [sic] (by cutting or pasting those numbers into the website), manually designating which phone numbers to which text messages would be sent," whereas here Opera loaded a list of numbers onto the Platform and, in addition, customers could sign up to join the list.  ([44] at 6).  The Luna court, however, noted that an "existing list of phone numbers" could be "upload[ed]" into the website, and that, additionally, "customers could add themselves to the platform by sending their own text messages to the system."  122 F. Supp. 3d at 937.  This description appears to be nearly identical to how Opera operated the Platform at issue here.

---

5    Plaintiff argues the Court should discount the Luna opinion because it is on appeal before the United States Court of Appeals for the Ninth Circuit.  On November 20, 2015, the appeal was dismissed.

14

Plaintiff next argues that the system in Luna sent text messages from the website directly to cellular telephones, whereas, here, "Defendants' texting system includes a 'platform' that handles the connection between the client (here Opera) and cell phone carriers like MetroPCS, not end cell phone users." ([44] at 7). Plaintiff offers a strained reading of Luna. The Luna court merely stated that, as a result of the process initiated by the defendant—that is, logging onto the system, typing in the message, and clicking send or scheduling when the message should be sent—"an allegedly unwanted text message was sent to Plaintiff." 122 F. Supp. 3d at 937. This statement does not support Plaintiff's position that the system sent the message directly from the website to cellular telephones. Even if the system directly sent text messages, the other factual similarities between the human intervention required to use the Platform and that required to use the Luna system persuade the Court that the reasoning of the Luna court applies here.[6]

Plaintiff next argues that, if the Court were to adopt the Luna court's reasoning, it would ignore the 2015 FCC Order. First, the 2015 FCC Order "is not

---

[6] As Plaintiff admits, the factual record in Luna "is not sufficiently detailed." ([44] at 7). Plaintiff nevertheless attempts to use the lack of detail in the Luna opinion to manufacture a difference between the Luna system and the Platform here.

15

dispositive of the present case because the FCC issued its ruling after the [text messages] in question . . . ." Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1246 (11th Cir. 2014). Second, the Luna court thoroughly discussed the 2015 FCC Order, and concluded the level of human intervention required to send text messages precluded liability. See 122 F. Supp. 3d at 939-40. Third, Plaintiff ignores that the 2015 FCC Order underscored that a defining characteristic of an autodialer is the ability to dial numbers without human intervention. See 30 FCC Rcd. 7961 ¶ 17. As the court in Derby v. AOL, Inc. observed, the 2015 FCC Order "does not suggest that a system that never operates without human intervention constitutes an ATDS under the statute. To the contrary, the 2015 [FCC] Order reiterates that the basic functions of an autodialer are to dial numbers *without human intervention* and to dial thousands of numbers in a short period of time." No. 5:15-CV-00452-RMW, 2015 WL 5316403, at *4 (N.D. Cal. Sept. 11, 2015), appeal dismissed (Mar. 18, 2016) (internal quotation marks omitted, emphasis in original). The importance of the human intervention element is supported by the decisions of other courts, including courts in our Circuit, that have acknowledged that the FCC's orders require that, "[t]o determine whether a dialer is a predictive dialing system, and therefore an ATDS, the primary consideration is whether human intervention is required at the point in time at which the number is dialed."

16

Strauss v. CBE Grp., Inc., —— F. Supp. 3d ——, 2016 WL 1273913 (S.D. Fla. Mar. 28, 2016) (internal quotations and ellipsis omitted); see also Legg v. Voice Media Grp., Inc., 20 F. Supp. 3d 1370, 1373 (S.D. Fla. 2014) (explaining that "defining characteristic" of ATDS is "capacity to dial numbers without human intervention"). Here, direct human intervention is required to send each text message immediately or to select the time and date when, in the future, the text message will be sent.

    Plaintiff also cites a number of cases she contends the Court should apply here in place of Luna. The Court first notes that the cases on which Plaintiff relies were expressly rejected by the Luna court because the facts of those cases were distinguishable. The Court agrees with the Luna court's analysis. For instance, Plaintiff relies on Sterk v. Path, Inc., 46 F. Supp. 3d 813 (N.D. Ill. 2014). In Sterk, however, it was "undisputed" that the automated dialing system "made calls from the list without human intervention." 46 F. Supp. 3d at 819-20. That is not the case here. Similarly, the system in Griffith v. Consumer Portfolio Serv., Inc., 838 F. Supp. 2d 723 (N.D. Ill. 2011) used predictive dialing software that reviewed accounts that satisfied certain pre-selected criteria, copied the telephone numbers associated with those accounts into a new file, and independently dialed the numbers in the file. See id. at 724. In Moore v. Dish Network L.L.C., 57 F. Supp.

17

3d 639 (N.D.W.V. 2014), the lists of numbers were transferred to the dialer without human intervention, and the dialer automatically dialed numbers from those lists. Id. at 655. The court in Davis v. Diversified Consultants, Inc., 36 F. Supp. 3d 217 (D. Mass. 2014) did not consider the human intervention element of the ATDS analysis. In each of these cases—unlike here—the system itself dialed numbers. Cf. In re Collecto, Inc., No. 14-MD-02513-RGS, 2016 WL 552459, at *4 n.9 (D. Mass. Feb. 10, 2016) ("In the cases Collecto cites in support of its argument [that the system is not an ATDS], human intervention was required to *dial* the target telephones, not simply to activate the process (by assembling a list of numbers and uploading them to the dialer)." (emphasis in original) (citing Luna, 122 F. Supp. 3d 936; Gragg v. Orange Cab Co., Inc., 995 F. Supp. 2d 1189 (W.D. Wash. 2014) ("[T]he dispatcher must have pressed 'enter' to transmit . . . information to both the TaxiMagic program and the nearest available driver."))).

    The Court finds the Luna court's reasoning sound and consistent with the reasoning of other courts' findings that human intervention discredits that a communication system is an ATDS. The Court finds that, in this case, the uncontested evidence shows human intervention was required to send each text message. "In sum, [Plaintiff's] claims fail as a matter of law because [s]he failed

18

to establish a genuine issue for trial with respect to whether the [texts] were [sent] using an ATDS, a necessary element of [her] claims." Gaza v. LTD Fin. Servs., L.P., No. 8:14-CV-1012-T-30JSS, 2015 WL 5009741, at *4 (M.D. Fla. Aug. 24, 2015). Defendants' Motion is granted.[7, 8]

---

[7] In reaching this conclusion, the Court considered the arguments set out in Plaintiff's Motion. The Court did not, however, consider the facts set forth in Plaintiff's statement of material facts. Under the local rules of this Court, Plaintiff's statement of material facts was required to be filed separately. L.R. 56.1(B)(1), NDGa. "[B]ecause [Plaintiff] included her facts only in her [] brief, but not in a separate document, the Court is not permitted to consider such fact[s] in resolving any pending motion for summary judgment." Boone v. City of McDonough, No. 1:12-CV-1036-WSD, 2013 WL 4670480, at *5 (N.D. Ga. Aug. 29, 2013), aff'd, 571 F. App'x 746 (11th Cir. 2014) (internal quotation marks omitted); see also Robinson v. Fulton Cty., No. CIVA 105CV-2250-RWS, 2008 WL 78711, at *6 (N.D. Ga. Jan. 4, 2008); L.R. 56.1(B)(1), NDGa. ("The court will not consider any fact . . . set out only in the brief . . . ."). Even if the Court considered the facts Plaintiff included in her statement of material facts, the facts do not change the Court's analysis or its conclusion. The facts upon which the Court bases its conclusion are those facts relevant to the human intervention analysis. Plaintiff does not dispute the core facts of this analysis: to send a text message, Opera employees navigated to the Platform's website, logged in, typed in the text of the message to be sent, either clicked "send" to send the message immediately, or scheduled a future date and time for the message to be sent using the Platform's drop-down calendar function. (See DSOMF ¶¶ 64-74; PRDSOMF ¶¶ 64-74). Accordingly, Plaintiff's Motion is denied, and Plaintiff's Motion for Leave is denied as moot.

[8] Because the Court grants summary judgment to Defendants, the Court is not required to address Defendants' arguments they are entitled to partial summary judgment on Plaintiff's claim for treble damages. The Court also denies as moot mGage's Motion seeking partial summary judgment, and denies as moot Plaintiff's Motion to Strike mGage's Motion.

19

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Colette Jenkins's Motion for Summary Judgment [34] is **DENIED**.

**IT IS FURTHER ORDERED** that mGage's Motion for Partial Summary Judgment [36] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants mGage, LLC and LL Atlanta, LLC d/b/a Opera Nightclub's Motion for Summary Judgment [37] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike mGage's Motion [47] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Plaintiff's Statement of Facts (Out-of-Time) [54] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 12th day of August, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

20